Argued and submitted May 29, 2013, affirmed January 22, petition for review denied July 9, 2015 (357 Or 550)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BILLY KEVIN BAUCUM,
*Defendant-Appellant.*

Grant County Circuit Court
0912308CR; A146855

343 P3d 235

W. D. Cramer, Jr, Judge.

Kali Montague, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Paul L. Smith, Attorney in Charge, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Justice J. Rillera, Assistant Attorney General.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Wollheim, Senior Judge.*

WOLLHEIM, S. J.

---

* Haselton, C. J., *vice* Rasmussen, J. pro tempore

## WOLLHEIM, S. J.

After a jury trial, defendant was convicted of driving under the influence of intoxicants. ORS 813.010(4). He appeals and assigns error to the admission of expert testimony of his probable blood alcohol concentration (BAC) at the time that he was stopped, based on a mathematical calculation called retrograde extrapolation. Defendant contends that the expert's testimony constituted scientific evidence for which the state did not provide an adequate foundation. We agree with defendant that the evidence was scientific evidence, but we reject defendant's challenges to the adequacy of the state's foundation for the admissibility of the evidence; we therefore affirm.

On November 24, 2009, at approximately 7 p.m., Trooper Timko was on patrol and observed defendant driving an automobile with a broken taillight. Timko stopped defendant and explained the reason for pulling him over. In conversing with defendant, Timko smelled a strong odor of alcohol emanating from inside the automobile and also from defendant's breath. He also observed that defendant's eyes were bloodshot and glassy and his eyelids were droopy, his face was flush, his movements were slow, and his speech was slurred.

Timko asked defendant if he had been drinking that day, and defendant acknowledged that he had consumed two beers and that he had stopped drinking about an hour before he was stopped by Timko.[1] Timko asked and received consent from defendant to conduct, while defendant sat in the vehicle, a modified horizontal gaze nystagmus (HGN) test. After conducting the test, Timko concluded from his observations that defendant was under the influence of intoxicants.

Next, Timko asked defendant if he would be willing to perform some field sobriety tests (FSTs) outside the car and, when defendant agreed, Timko advised defendant of his *Miranda* rights, then explained to defendant that he was not under arrest and did not have to answer questions if he did not want to. Timko then asked defendant some pretest medical questions, such as "Are you diabetic? Taking

---

[1] Defendant later explained to Timko that each beer contained 24 ounces of malt liquor.

insulin? Do you have any eye disorders, recent head traumas?" Defendant responded that he had low blood sugar and had not eaten since breakfast. At some point during the tests, defendant reiterated that he had not eaten all day and was feeling unwell, and he wanted to get something to eat before he finished the tests, but the trooper explained that he would first need to perform the tests.

Defendant performed, and failed, the HGN test, the walk-and-turn test, and the one-leg-stand test. Timko arrested defendant, transported him to the jail, and requested that he take a breath test, which defendant refused. Timko then applied for and received a search warrant to draw blood samples from defendant. A nurse took blood samples from defendant at 10:18 p.m. and 11:21 p.m.[2] Testing of those samples indicated that defendant's BAC was 0.039 percent at 10:18 p.m. and 0.015 percent at 11:21 p.m.

Prior to trial, defendant filed a motion *in limine* to preclude the state from offering the testimony of Michael Dean Jackson, Ph.D., a forensic scientist employed with the Oregon State Police Forensic Services Division. Jackson's anticipated trial testimony was that, based on a mathematical process called retrograde extrapolation, he could reliably determine defendant's BAC at the time of the traffic stop. Defendant argued that Jackson's testimony would constitute scientific evidence for which the state must provide an adequate foundation under *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), and *State v. Brown*, 297 Or 404, 687 P2d 751 (1984). Defendant further argued that the evidence would not meet those foundational requirements and, therefore, should not be admitted at trial.

The state contended that the testimony was not scientific,[3] but nonetheless participated in an OEC

---

[2] There is conflicting evidence as to when the first blood draw took place. Some evidence indicates that the first blood sample was drawn at 10:48 p.m. That conflict does not affect our decision.

[3] As defendant conceded at trial, it is "common knowledge" that a person's BAC decreases once the person stops drinking alcohol. That is not the issue here. The issue is whether there is a reliable method for determining a person's BAC at a time in the past, based on various factors, when the person's BAC was not tested at that time.

104[4] hearing, at which Jackson testified. That testimony included Jackson's expertise and education in retrograde extrapolation; his expertise in calculating an individual's BAC at a prior point in time using the results from a later blood or breath test; his explanation that a "multitude of studies" had been conducted on retrograde extrapolation to determine what variables affected the calculation; and his opinion that the calculation of an individual's prior BAC is reliable, generally accepted, and commonly used in forensic studies, as long as certain variables are known.

The calculation, Jackson testified, was a "simple algebraic equation" that required knowledge of (1) the BAC results from an individual's blood or breath test, (2) the number of hours between the blood draw or breath test and the police stop, and (3) the rate of alcohol elimination from the person's body. Jackson further testified that he was comfortable doing the calculation if he also knew when the individual being tested had stopped drinking alcohol and whether the individual had consumed any food with the alcohol.

After hearing the proffered evidence, the trial court ruled that Jackson's testimony constituted scientific evidence and that the state had met the foundational requirements for that evidence. The trial court denied defendant's motion *in limine*.

At trial, the state offered Jackson's testimony to establish defendant's BAC at the time of the police stop. Jackson was given information that defendant had stopped drinking an hour before the police stop and that he had

---

[4] OEC 104 provides, in part:

"(1) Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

"(2) When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

"(3) Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if the accused so requests."

eaten little food on the day in question. He then performed the calculation by multiplying the number of hours between the stop and the blood draw—3.3 hours—with the range of elimination rates—0.010 percent to 0.025 percent. To that range of results—0.033 percent to 0.0825 percent—he then added the BAC result from the first blood draw—0.039 percent—and concluded that defendant's BAC at the time of the stop ranged between 0.072 percent and 0.121 percent.[5]

Defendant was convicted, and, on appeal, he assigns error to the trial court's ruling denying his motion *in limine* allowing Jackson to testify at trial.

Our review of the trial court's admission of Jackson's testimony involves two questions: (1) was the evidence scientific, and (2) if so, was it admissible as such. *State v. Sampson*, 167 Or App 489, 495, 6 P3d 543, *rev den*, 331 Or 361 (2000). This court has already determined that testimony using retrograde extrapolation to determine an individual's BAC at a prior point in time is scientific evidence. *State v. Whitmore*, 257 Or App 664, 672, 307 P3d 552 (2013). Thus, the only issue is whether Jackson's testimony was admissible scientific evidence. To answer that question, we review the facts underlying the admissibility of the proffered evidence *de novo. State v. Branch*, 243 Or App 309, 314, 259 P3d 103, *rev den*, 351 Or 216 (2011). The underlying facts can include the record, legal and scientific literature relating to the evidence that the parties have provided, as well as other pertinent legal and scientific literature. However, the ultimate conclusion as to whether Jackson's testimony was admissible is a question of law. *Sampson*, 167 Or App at 495. In this case, because defendant assigns error only to the trial court's denial of his motion *in limine*, and because defendant

---

[5] If the jury found that defendant's BAC at the time of the stop was below 0.08, the state would have to prove that the alcohol defendant consumed impaired his driving. ORS 813.010(1)(b). If the jury found that defendant's BAC at the time of the stop was 0.08 percent or above, ORS 813.010(1)(a) establishes that defendant was impaired.

The state argued to the jury that, because defendant was suffering from hypoglycemia at the time of his stop, he was more susceptible to the effects of alcohol, and was therefore impaired, even with a lower BAC. To support that argument, the state elicited testimony from defendant's mother that, when defendant is having a hypoglycemic episode and drinks alcohol, "he's more out of it" than when he is having an episode without having consumed alcohol.

did not make any objections to the evidence during Jackson's testimony before the jury, we are limited to the arguments that defendant raised in his motion *in limine. See State v. Perry*, 347 Or 110, 116-17, 218 P3d 95 (2009).

Scientific evidence is admissible if it passes the requirements of three separate rules of evidence:

"It must be relevant, OEC 401;[6] it must possess sufficient indicia of scientific validity and be helpful to the jury, OEC 702;[7] and its prejudicial effect must not outweigh its probative value, OEC 403."[8]

*State v. Southard*, 347 Or 127, 133, 218 P3d 104 (2009).

Defendant's sole argument to the trial court was that the evidence did not possess sufficient indicia of scientific validity, and we therefore address the admissibility of the evidence solely under OEC 702. We begin with an excerpt from defendant's motion *in limine* explaining retrograde extrapolation:[9]

"Retrograde extrapolation is the computation back in time of the blood-alcohol level, *i.e.*, the estimation of the level at the time of driving based on a test result from some later time. * * *

"* * * As alcohol is consumed, it passes from the stomach and intestines into the blood, a process referred to as absorption. When the alcohol reaches the brain and nervous system, the characteristic signs of intoxication begin to show. The length of time necessary for the alcohol to be

---

[6] OEC 401 provides that evidence is admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[7] OEC 702 provides, "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[8] OEC 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[9] Although our review of defendant's arguments is limited to what was raised at the OEC 104 hearing, we are not limited to the explanation of retrograde extrapolation at that hearing. *See Branch*, 243 Or App at 314. Consequently, Jackson's testimony at trial is part of the *de novo* record we may review to ascertain the underlying facts of retrograde extrapolation.

absorbed depends on a variety of factors[.] At some point after drinking has ceased, the person's BAC will reach a peak. After the peak, the BAC will begin to fall as alcohol is eliminated from the person's body. The body eliminates alcohol through the liver at a slow but comparatively consistent rate.

"In 1932, Swedish chemist E.M.P. Widmark first calculated absorption and elimination rates in the body, and his work still represents the benchmark for other scientists' studies today. Widmark created what we know today as the 'BAC curve,' which represents the rise and fall of an individual's BAC as his body absorbs and eliminates alcohol."

(Footnotes omitted; citations omitted.)

Jackson's testimony was consistent with the above explanation. What informed Jackson's opinion, and what is therefore significant to the facts of this case, is the BAC curve's distinct phases of alcohol absorption and elimination. Jackson explained that he was comfortable doing his calculation if he knew the time when defendant stopped drinking and whether he had eaten any food while he was drinking. That would enable him to know whether defendant was in the absorption or elimination phase of the BAC curve. "In general," Jackson testified,

"individuals are going to reach their peak blood alcohol concentration within about a half an hour and be what is referred to as fully absorbed within about a half an hour. *** Given the fact that it typically takes an individual about a half an hour to peak and then a half an hour to be fully absorbed, the individual would be fully absorbed by seven o'clock if he stopped drinking by 6:00."

Having information that defendant had eaten little on the day in question and had stopped drinking an hour before the stop, Jackson performed his calculation under the assumption that, at the time of the stop, defendant was fully in the elimination phase of the BAC curve, *i.e.*, the concentration of alcohol in defendant's system was declining.

Defendant argued below, and now argues on appeal, that Jackson's testimony was not admissible scientific testimony for two reasons: (1) retrograde extrapolation is "junk science" that is not generally accepted in the

relevant scientific community; and (2) Jackson had "insufficient knowledge as to the time and quantity of drinking, as well as other physiological factors[,]" that "would have to be accounted for" in performing a valid extrapolation. In particular, defendant argues that Jackson's use of the range of elimination rates from 0.010 percent to 0.025 percent did not sufficiently account for the varying factors that could have affected defendant's particular elimination rate. As we understand defendant's arguments, his first pertains to the admissibility of retrograde extrapolation in general, and his second pertains to Jackson's application of retrograde extrapolation to these particular facts. We address each separately.

A. *Is Retrograde Extrapolation Analysis Generally Admissible Under OEC 702?*

Expert testimony under OEC 702 has three basic requirements: "The witness must qualify as an expert, his testimony must be helpful * * *, and he must have an adequate basis for what he says[.]" *O'Key*, 321 Or at 291 (quoting Christopher B. Mueller & Laird C. Kirkpatrick, *Modern Evidence* § 7.8, 990 (1995)). When the evidence is scientific evidence, the trial court should also consider the special concerns that attend that type of evidence. In *O'Key*, the court explained the trial court's function in acting as a gatekeeper for scientific evidence:

> "Evidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power. The function of the court is to ensure that the persuasive appeal is legitimate. The value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert. * * * Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should be supported by the appropriate scientific validation."

321 Or at 291-92 (footnote omitted; citation omitted).

Determining the "scientific validity of the general propositions utilized by [an] expert" does not mean determining whether the expert's ultimate conclusion is valid. The court's role is to determine whether the expert's opinion

derives from the scientific method, which is "a validation technique, consisting of the formulation of hypotheses, followed by observation or experimentation to test the hypotheses." *O'Key*, 321 Or at 292 (citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579, 593, 113 S Ct 2786, 125 L Ed 2d 469 (1993)); see *also Daubert*, 509 US at 595 (stating that the trial judge's focus "must be solely on principles and methodology, not on the conclusions that they generate"); *Markum v. Adventist Health System/West*, 345 Or 237, 244-45, 193 P3d 1 (2008) (explaining that "the fundamental question" is the "scientific validity of the *general propositions* utilized by the expert" (citations omitted; internal quotation marks omitted; emphasis added)).

In *O'Key*, the court explained that the admissibility of scientific evidence under OEC 702 can be reduced to two questions: Is the expert's testimony based on "scientifically valid principles," and is the testimony "pertinent to the issue to which it is directed." *O'Key*, 321 Or at 303. To assist in addressing that first question, the Supreme Court in *Brown* and *O'Key* listed factors that a court should consider.[10] Not all factors "will necessarily apply in a given case, nor has the court required that all or even a majority of the applicable factors be satisfied for evidence to be admissible." *Southard*, 347 Or at 134. Moreover, we consider only the factors that were contested in the trial court at the OEC 104 hearing.

### 1. *General Acceptance*

Defendant's argument in his motion *in limine* was that the literature indicates that scientists "significant in either number or expertise publicly oppose [retrograde extrapolation] as unreliable[.]" The basis for that assertion is not clear for, although defendant cites some articles as

---

[10] In *Brown*, the court listed seven primary factors: (1) the technique's general acceptance in the field; (2) the expert's qualifications and stature; (3) the use which has been made of the technique; (4) the potential rate of error; (5) the existence of specialized literature; (6) the novelty of the invention; and (7) the extent to which the technique relies on the subjective interpretation of the expert. 297 Or at 417.

In *O'Key*, the factors are (1) whether the theory or technique in question can be tested; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error; and (4) the degree of acceptance in the relevant scientific community. 321 Or at 303-04. Those factors overlap, to some degree, with the factors in *Brown*. *Southard*, 347 Or at 134 n 4.

support for that assertion, he did not include the treatises in the record or otherwise offer any evidence for that assertion. A review of treatises and literature on retrograde extrapolation indicates that it is used not only to test blood alcohol concentrations, but in disciplines such as pharmacology to determine correct drug dosages for individuals. Mark R. Montgomery and Mark J. Reasor, *Retrograde Extrapolation of Blood Alcohol Data: An Applied Approach*, 36 Journal of Toxicology and Environmental Health 281, 283 (1992). Dubowski, an expert whose work defendant cites, is quoted by the authors of *Scientific Evidence*:

> "In my opinion, extrapolation of [blood-alcohol] concentration from one or more known BAC * * * measurement value at established times to another relevant time *can be performed with scientific validity and forensic acceptability to a stated degree of probability* * * * *if sufficient relevant and material information concerning the subject and the events in issue exists and is available.* Whether these conditions are satisfied in a given instance is a question of fact, which cannot be generalized."

Paul C. Gianelli and Edward J. Imwinkelried, Jr., *Scientific Evidence* § 22.04, at 534 (5th ed 2012) (citations omitted; emphasis added).

Moreover, contrary to defendant's arguments, the case law[11] in other jurisdictions indicates that there is general acceptance of retrograde extrapolation, so long as the expert has sufficient information to determine where on the BAC curve—in the absorption phase, at the peak, or in the elimination phase—the defendant was at the time of the stop and at the time of the blood, urine, or breath test. Texas courts, which have the most extensive case law regarding retrograde extrapolation, have concluded that retrograde extrapolation is a reliable technique if certain factors are known. *Mata v. State*, 46 SW3d 902, 916 (Tex Ct Crim App 2001). In *Mata*, the court said:

> "We believe that the science of retrograde extrapolation can be reliable in a given case. The expert's ability to apply

---

[11] The court in *O'Key* included, as an additional factor to consider, "the extent to which other courts have permitted expert testimony based on the process or technique." 321 Or at 306 n 28 (citing *United States v. Downing*, 753 F2d 1224, 1238 (3d Cir 1985)).

the science and explain it with clarity to the court is a paramount consideration. In addition, the expert must demonstrate some understanding of the difficulties associated with a retrograde extrapolation. He must demonstrate an awareness of the subtleties of the science and risks inherent in any extrapolation. Finally, he must be able to clearly and consistently apply the science.

"The court evaluating the reliability of a retrograde extrapolation should also consider (a) the length of time between the offense and the test(s) administered; (b) the number of tests given and the length of time between each test; and (c) whether, and if so, to what extent, any individual characteristics of the defendant were known to the expert in providing his extrapolation. These characteristics and behaviors might include, but are not limited to, the person's weight and gender, the person's typical drinking pattern and tolerance for alcohol, how much the person had to drink on the day or night in question, what the person drank, the duration of the drinking spree, the time of the last drink, and how much and what the person had to eat either before, during, or after the drinking."

*Id.*

Other jurisdictions that require the expert to have sufficient facts to accurately plot a defendant's BAC placement on the BAC curve include New Mexico, *State v. Downey*, 145 NM 232, 239-40, 195 P3d 1244, 1251-52 (2008); and Nevada, *State v. Armstrong*, 267 P3d 777, 780-81 (Nev 2011) (reasoning that the expert's lack of knowledge about whether the defendant was absorbing or eliminating alcohol at the time of the blood draw created too great a danger of unfair prejudice to defendant). And other jurisdictions allow the expert to use general assumptions in plotting where, on the BAC curve, a defendant was at the time of the police stop. *See State ex rel. Montgomery v. Miller*, 234 Ariz 289, 304-05, 321 P3d 454, 469-70 (Ariz Ct App 2014); *State v. Burgess*, 188 Vt 235, 241-44, 5 A3d 911, 915-17 (2010); *Smith v. State*, 942 So2d 308, 317-18 (Miss App 2006); *State v. Vliet*, 95 Haw 94, 102-114, 19 P3d 42, 51-62 (2001); *Com. v. Senior*, 433 Mass 453, 460-62, 744 NE 2d 614, 619-21 (Mass 2001). Defendant has been unable to point to any jurisdiction in which the courts have determined that retrograde extrapolation is inadmissible scientific evidence in

all circumstances. We therefore conclude that retrograde extrapolation—the mathematical process of plotting backwards a defendant's BAC on a BAC curve when given sufficient facts to do so—is generally accepted in the relevant scientific community and in the courts.

### 2. *Peer Review, Testability, and Literature.*

Jackson testified that, since Widmark's first studies on the absorption, peak and elimination of alcohol in the body, "[t]here have been a multitude of studies that have been conducted *** looking at a variety of different conditions, such as the presence or absence of food, when the alcohol is consumed, the types of alcohol that are consumed, various aspects of the pharmacokinetics." Indeed, many studies have looked at the factors that affect the rate of alcohol absorption and the rate of elimination, and indicate that there are certain variables that consistently affect those rates, and predictable patterns on the BAC curve.[12] Defendant has offered no evidence to counter Jackson's testimony.

### 3. *Error Rate and Governing Standards*

Defendant's main argument against the admissibility of expert testimony using retrograde extrapolation is that retrograde extrapolation is dependent on too many unknown and subjective variables. Consequently, defendant argues, the calculation is unreliable and leads to inconsistent results.

Defendant's argument does not sufficiently unbundle the two processes that occur when alcohol enters the body—alcohol absorption and alcohol elimination—and how those phases affected Jackson's opinion. As defendant

---

[12] *See* Justin Noval and Edward J. Imwinkelried, Jr., *Retrograde Extrapolation of Blood Alcohol Concentration*, 50 No. 1 Crim Law Bulletin ART 7 (Westlaw Next 5, 10) (2014) (explaining Widmark's conclusions that the body absorbs and eliminates alcohol in a predictable fashion, that certain factors affect when peak absorption will occur, and indicating that Widmark found elimination rates ranging from 0.010 to 0.020 percent per hour); Alan Wayne Jones, *Evidence-based survey of the elimination rates of ethanol from blood with applications in forensic casework*, 200 Forensic Science International 1, 14 (2010), http://dx.doi.org/10.1016/j.forsciint.2010.02.021 (accessed Jan 15, 2015) (suggesting, from the results of studies, that experts use a range of elimination rates from 0.010 to 0.025 percent per hour).

pointed out in his motion *in limine*, the speed of a person's peak *absorption* is dependent on variables such as "the presence and type of food in the stomach, the person's gender, the person's weight, the person's age, the person's mental state, the drinking pattern, the type of beverage consumed, the amount consumed, and the time period of alcohol consumption." (Citations omitted; footnotes omitted).[13] Jackson, in fact, agreed that many of those factors can affect when one reaches peak absorption. However, Jackson concluded, from his knowledge of the literature and the various studies, that defendant had reached peak absorption at the time of the stop. Accordingly, he performed his calculation on the assumption that defendant was fully in the elimination phase of the BAC curve. He based that conclusion on the factors that he considered most important: that defendant had stopped drinking an hour before the stop and had not eaten all day; that Jackson's study of retrograde extrapolation indicated that alcohol is fully absorbed in a person's body within an hour after a person stops drinking alcohol;[14] and that the results of defendant's two blood tests indicated that defendant was in the elimination phase of the BAC curve.[15]

---

[13] Jones, another expert whose studies defendant cites, reported, from one of his studies, that the time needed to reach peak BAC depends on such variables as the individual's "drinking pattern, the type of beverage consumed, the fed or fasted state, the nature (liquid or solid) and composition of foodstuff in the stomach, the anatomy of the gastrointestinal canal, and the mental state of the [individual.]" A.W. Jones, K. A. Jonsson, A. Neri, *Peak Blood-Ethanol Concentration and the Time of Its Occurrence After Rapid Drinking on an Empty Stomach*, 36 Journal of Forensic Sciences 376, 381 (1991). Other studies have indicated that, as both defendant and Jackson noted, consuming food with alcohol can slow down the speed of alcohol absorption, as can fear, pain, emotional disturbances, stress, exercise, and shock. Noval and Imwinkelried, 50 No 1 Crim Law Bulletin ART 7, (WestlawNext at 10).

[14] Articles on retrograde extrapolation indicate that some studies show individuals reach peak BAC between forty-five and seventy-five minutes after the last drink was consumed, and other studies show that peak BAC is reached in as few as fifteen minutes and as long as three hours. Noval and Imwinkelried, 50 No. 1 Crim Law Bulletin ART 7 (WestlawNext at 10). In one study performed by Jones, 77 percent of the subjects reached peak BAC within 45 minutes after they stopped drinking, and 92 percent reached peak BAC within 75 minutes. Jones, Jonsson, Neri, 36 Journal of Forensic Sciences at 378-79.

[15] Literature on retrograde extrapolation indicates that experts uniformly agree that administering multiple BAC tests can "establish a clear trend of either rising or falling BAC." Noval and Imwinkelried, No. 1 Crim Law Bulletin ART 7, at 14.

Jackson's testimony effectively negated the need to consider any other factors affecting peak absorption. Defendant never challenged Jackson's assertions regarding when peak absorption occurs; nor did he offer evidence indicating that Jackson's assertions were incorrect. Consequently, the numerous factors that defendant relies on to support his argument that retrograde extrapolation is unreliable are inapposite to the admissibility of the evidence here, for they pertain to whether a person has reached peak absorption, and defendant challenged neither Jackson's assumption that defendant had already reached peak absorption, nor the underlying assertions that supported that assumption.

What remains of defendant's argument pertains to alcohol elimination. The problem, as Jackson explained, with determining the elimination rate is not that there are too many variables affecting the elimination rate but, instead, that an actual elimination rate is unknown[16] unless a person's blood is tested at regular intervals over several hours. Thus, in the context of a DUII case, there is no practical means by which one could determine a person's actual elimination rate. Jackson explained that many experts use an average elimination rate, but he uses a range of rates that he has determined, from the studies and literature, accounts for 95 percent of the population, and includes the lowest elimination rates recorded in the studies, to a rate that would "represent individuals [who] do consume alcohol on a pretty frequent basis."

Defendant urges us to find that retrograde extrapolation lacks sufficient indicia of reliability, because defendant's real elimination rate is unknown, because there is the possibility that defendant's elimination rate is within the 5 percent of the population not accounted for in Jackson's rate range, and because there is no uniform elimination rate or range of rates used by the experts in performing

---

[16] Jackson testified:

"I don't like to use an actual or specific elimination rate simply because I don't know what the elimination rate of the defendant was at the time of the stop, nor do I know what his * * * elimination rate was at the time of the blood draw. I don't even know my own elimination rate. On top of that, the elimination rate of an individual can vary from day to day or week to week."

retrograde extrapolations. We reject defendant's arguments for two reasons. First, we reiterate that our role is to determine whether retrograde extrapolation is based on the scientific process and is pertinent to the issue to which it is directed. Jackson testified that his range of elimination rates is consistent with the range of elimination rates found in the scientific literature on retrograde extrapolation, and that those rates consistently account for all but 5 percent of the population. That testimony indicates that Jackson utilized the scientific method in determining his range of rates, and defendant neither challenged that testimony, nor otherwise introduced evidence discrediting it. Second, the Oregon Supreme Court has stated that the absence of a method to verify one factor in a scientific conclusion does not render the entire conclusion invalid. *Southard*, 347 Or at 138. In such cases, the court is "required to look more closely at other factors that offset the unavailability of that indicator." *Id.* The other factors we have already mentioned militate against declaring the science of retrograde extrapolation inadmissible because a person's actual elimination rate is unknown. We reject the challenges that defendant raised at the OEC 104 hearing as bases for concluding that retrograde extrapolation does not contain sufficient indicia of reliability or meet the requirements of OEC 702 and the holdings of *Brown* and *O'Key*.[17]

---

[17] On appeal, defendant also argues for the first time that the lack of a standard calculation renders the process unreliable. "[D]ifferent experts use significantly different formulas[,] including different variables and different elimination rates," defendant argues. Defendant points to the various calculations that are used to extrapolate a prior BAC: One formula, defendant argues, accounts for such variables as: "(1) liquid ounces of alcohol consumed, (2) body weight, (3) reduced body mass, (4) time, and (5) burn-off rate," and another formula involves "a complex calculation of the driver's body water weight, concentration in water per dose of alcohol, blood alcohol concentration from water weight calculation, adjusted alcohol content in the drink, multiplied by the number of ounces consumed, and decreased by the elimination rate." Defendant similarly argues that the existence of these varying calculations means that retrograde extrapolation is not settled science. Moreover, he argues, Jackson's simplified calculation simply relied on too few variables.

Defendant did not argue to the trial court that there were differing calculations used in retrograde extrapolation or that the lack of a standard calculation rendered Jackson's testimony and calculation inadmissible. Nor did defendant argue to the trial court that Jackson's simplified calculation was an unacceptable calculation for retrograde extrapolation. We therefore decline to consider that argument on appeal. *See Perry*, 347 Or at 123 n 14. ("[W]here a trial court has ruled that certain evidence is admissible as 'scientific evidence,' a party

B. *Was Jackson's Application of Retrograde Extrapolation Admissible Under OEC 702?*

Defendant further argues that, regardless of whether retrograde extrapolation is generally admissible, Jackson's testimony was inadmissible because his range of elimination rates was unreliable. In part, defendant reprises the same argument that he made regarding the general reliability of elimination rates in retrograde extrapolation—that there are too many variables affecting the elimination rate that are unknown in general and were unknown in this particular case. As in the context of the admissibility of retrograde extrapolation generally, defendant's argument as it applies to Jackson particularly is likewise unavailing.

Defendant contends that Jackson's testimony did not contain sufficient indicia of reliability because his particular range of elimination rates—0.010 percent to 0.025 percent—was broader than the range used by most other experts. But defendant did not argue below, much less present evidence, that the range of elimination rates used by Jackson was unreliable. In any event, we conclude that that argument pertains to the weight that the trier of fact could, or should, give Jackson's testimony, and not its admissibility. *See Markum*, 345 Or at 250. Jackson acknowledged that he used a different range of rates from many experts, but he explained that his higher top rate—0.025 percent—accounts for the elimination rates that studies have indicated represent the elimination rates of individuals who "consume alcohol on a regular basis."

In *State v. Sanchez-Alfonso*, 352 Or 790, 804, 293 P3d 101 (2012), the court explained how an expert may meet the requirements of OEC 702:

> "[T]he expert must explain * * * precisely his or her own expertise, how he or she gathers and uses particular information, how that information informs his or her conclusions, and the scientific basis for the steps that he or she takes in that process."

ordinarily may not predicate a claim of reversible error on the court's failure to address one or more criteria that the party did not argue.").

Defendant's other arguments pertaining to the *Brown* and *O'Key* factors were likewise not preserved at trial, and we decline to consider them on appeal.

In this case, Jackson testified as to (1) the process by which he gathered knowledge on retrograde extrapolation, including the courses he had taken and the studies he had read; (2) the generally accepted understanding in forensic sciences of the process by which alcohol is absorbed, peaks, and is eliminated from the body; (3) the variables that are generally considered to affect the absorption and elimination of alcohol in a person's body; (4) the evidence that he considered in accounting for those variables; and (5) his reasoning process in applying that evidence to the generally accepted principles of alcohol absorption and elimination. Based on the arguments that he preserved and presented at the OEC 104 hearing, defendant has not persuaded us that Jackson's testimony applying the science of retrograde extrapolation failed to meet the admissibility requirements of OEC 702.

We therefore conclude that retrograde extrapolation is scientific evidence under OEC 702; that defendant's arguments, preserved and raised on appeal, do not establish that the state's foundation for use of the evidence was inadequate; and that the trial court did not err in admitting evidence of Jackson's particular use of retrograde extrapolation to determine defendant's BAC at the time of the stop.

Affirmed.