Argued and submitted May 10, Southridge High School, Beaverton, affirmed June 2, 2016

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

JON ANDRESEN HERMANSON,
*Defendant-Respondent.*

Washington County Circuit Court
C141751CR; A159752

377 P3d 688

Susan Yorke, Assistant Attorney General, argued the cause for appellant. With her on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

John H. Hingson III argued the cause and filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and DeHoog, Judge.

**SERCOMBE, P. J.**

Defendant was charged with driving under the influence of intoxicants (DUII), ORS 813.011, and other crimes. He moved to suppress evidence obtained after police officers entered a residence, without a search warrant, to seize him and obtain evidence of his intoxication. The trial court granted the motion to suppress. It concluded that the state failed to prove that the warrantless entry was justified under Article I, section 9, of the Oregon Constitution by the exigency of the circumstances. The state appeals. We agree with the trial court that the state failed to prove that it could not have obtained a warrant in sufficient time to avoid the loss of critical evidence and, accordingly, affirm.

We state the facts as drawn from the explicit and implicit findings of the trial court and consistently with its ruling on defendant's motion to suppress. *State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). At 7:12 p.m. on July 20, 2014, Everett Welker reported through a 9-1-1 call that defendant had just crashed his car into Welker's vehicle. According to Welker, defendant seemed to be impaired and smelled of alcohol, and, after quickly exchanging identification with Welker, defendant had left the scene in his car. Based on that report, Beaverton patrol officer Warner responded to the scene of the accident. There, Welker reiterated that defendant appeared intoxicated and described defendant's car and the direction that it had gone.

Warner and two other police officers pursued defendant in that direction and located defendant's car nearby, parked askew next to a garage of an apartment. At 7:32 p.m., Warner and the other police officers knocked on the apartment door and a woman told them that defendant was inside. Warner asked to speak to defendant. The woman replied, "yes," and shut the door. The officers knocked on the door again, and the woman again opened the door. She said that defendant was in the shower and the officers would have to wait. Warner explained that he was investigating whether defendant had driven while intoxicated and demanded to speak to defendant immediately. The woman shut the door.

A few minutes later, at approximately 7:42 p.m., Warner knocked again, the woman opened the door, and the police officers entered the apartment.

Defendant exhibited the usual signs of alcohol intoxication—red and watery eyes, slurred speech, unsteady gait, and the odor of alcohol. Warner administered the horizontal gaze nystagmus test, which indicated that defendant was under the influence of alcohol. Defendant was arrested and transported to jail, where he refused to take a Breathalyzer test. Warner testified that he "wrote up a search warrant [for a blood draw] and went and had a judge review it and he signed the warrant." That process took approximately 90 minutes. Defendant's blood was drawn approximately three hours after the 9-1-1 call.

Defendant moved to suppress the evidence of intoxication that resulted from the warrantless entry into the apartment. He argued that the entry was unlawful as an unreasonable search under Article I, section 9, and the Fourth Amendment to the United States Constitution. According to defendant, the search was unreasonable because it was neither authorized by a warrant nor immediately necessary to avoid the loss of significant evidence. The state responded that any delay in obtaining the dissipating evidence of intoxication would have resulted in the loss of significant evidence and that the search was justified by those exigent circumstances, no matter how long the delay might be.

The trial court concluded that the exigency, in the circumstances of a home search and seizure for evidence of intoxication, was not presumptive, and that it had not been proved by the state. The court reasoned:

> "[I]n order to get into the residence there has to be a showing that * * * a warrant is not realistic here. * * * And what I've heard here the—the evidence that I've heard here, the testimony, I'm just not persuaded that—again that that is not an option here. I'm just not convinced."

On appeal, the parties reiterate the arguments made below. The state contends that any delay in collecting dissipating evidence of intoxication results in a loss of

evidence and that the possibility of any such loss in most cases justifies a warrantless search of defendant's person or residence as reasonable because it is immediately necessary. Defendant counters that, while that kind of presumed exigency might justify a warrantless blood draw, the more intense intrusion into a residence requires actual and particular proof of the exigency. Specifically, defendant submits that to justify a warrantless entry into a home to obtain intoxication evidence, the state must show how long it would take to obtain a search warrant and that the police had an objectively reasonable belief that the evidence would be lost within that specified time. We agree with the trial court that the state did not present evidence to meet that burden of proof.[1]

In *State v. Machuca*, 347 Or 644, 227 P3d 729 (2010), in determining whether a search warrant was necessary before drawing the blood of a suspect arrested for DUII, the Oregon Supreme Court concluded that "the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will ordinarily permit a warrantless blood draw of the kind taken here." *Id.* at 657. Subsequent cases have confined any presumed exigency for the collection of blood alcohol evidence to warrantless blood draws from suspects arrested for DUII and to field sobriety tests. Instead, "the issue of exigency should be assessed in light of the reasonableness of the search in time, scope, and intensity." *State v. Mazzola*, 356 Or 804, 819-20, 345 P3d 424 (2015) (authorizing warrantless administration of field sobriety tests, a "limited intrusion," for evidence of drug impairment upon a person who has been validly stopped and subject to arrest for DUII).

Thus, in *State v. Sullivan*, 265 Or App 62, 78, 333 P3d 1201 (2014), we declined to extend *Machuca*'s exigency rule for blood draws from arrestees to a "fundamentally different type of government intrusion, a home entry." In order to justify a warrantless home entry, we required "some

---

[1] The state abandoned its contentions below that the search was consented to by the woman who answered the door and that defendant was captured in "hot pursuit" by the police. The state also did not argue below and prove that critical evidence other than blood alcohol content would be lost by any delay to obtain a home search warrant.

showing [by the state] as to how long it would have taken to obtain a warrant under the circumstances" so as to determine "to what degree—if any at all—that the potential evidence sought would have been 'sacrificed.'" *Id.* at 80; *see also State v. Rice*, 270 Or App 50, 346 P3d 631, *rev allowed*, 357 Or 550 (state's petition), *rev den*, 357 Or 743 (defendant's petition) (2015) (speculative evidence on whether a warrant could be obtained failed to prove exigency for warrantless home search).

We reiterated that rule in *State v. Ritz*, 270 Or App 88, 94, 347 P3d 1052, *rev allowed*, 357 Or 550 (2015)—also involving a warrantless home entry—stating that, "in cases involving the warrantless entry into a home, our analysis turns on an examination of whether a warrant could reasonably have been obtained without sacrificing evidence of the crime of DUII." We further explained:

> "We therefore conclude that, after first showing how long it would take to obtain a search warrant, the state may prove exigency by further showing that police had an objectively reasonable belief that the circumstances were such that, had they waited for that warrant, the suspect's blood would have lost all evidentiary value."

*Id.* at 98-99.

In *Ritz*, we determined that the state had made a sufficient showing of exigency. There, a warrantless home entry was made to collect evidence of alcohol intoxication from a DUII suspect who was hiding in the house. We distinguished prior cases concluding that there was no exigency and explained that, in those prior cases,

> "the state failed to make any showing as to how long it would have taken to obtain a search warrant. In this case, by contrast, [police officer] Lorentz testified that a telephonic warrant can take at least 45 minutes, and [police officer] Spini testified that it can take twice that long just to prepare the warrant application. The trial court found that testimony to be credible, and that finding is supported by the record. Rather than simply speculating that a judge might not be available, Spini and Lorentz testified about how long it would take *the police* to prepare to apply for a warrant. Their testimony was based on their own personal

experiences with other warrant applications and on their understanding of the application process in general."

*Id.* at 97 (emphasis in original).

We then reasoned that, once the time for obtaining a search warrant was known, that delay could be assessed to determine whether it was significant. Quoting from *Missouri v. McNeely*, ___ US ___, 133 S Ct 1552, 185 L Ed 2d 696 (2013), we noted that,

"[i]n *Missouri v. McNeely*, * * *, the Court considered how to apply the exigent circumstances exception to the warrant requirement in DUII cases. The Court observed that, 'as a result of the human body's natural metabolic processes, the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated.' *Id.* at ___, 133 S Ct at 1560. As a result of those metabolic processes, 'a significant delay in testing will negatively affect the probative value of the results.' *Id.* at ___, 133 S Ct at 1561.

"The Court did not explain precisely when an ordinary delay becomes a 'significant' delay. Nevertheless, it did suggest an answer to that question. The Court explained that, unlike 'circumstances in which the suspect has control over easily disposable evidence,' testing for [blood alcohol content (BAC)] does not present a true 'now or never' situation. *Id.* That is so because 'BAC evidence from a drunk-driving suspect naturally dissipates over time in a gradual and relatively predictable manner.' *Id.* That predictability allows police to measure a suspect's BAC level at a given point and use a technique called 'retrograde extrapolation' to estimate that person's BAC level at an earlier point. *See, e.g., State v. Baucum*, 268 Or App 649, 661, 343 P3d 235 (2015) (defining 'retrograde extrapolation' as 'the mathematical process of plotting backwards a defendant's BAC on a BAC curve when given sufficient facts to do so'). Because of this ability to, in effect, reconstruct a person's BAC level at an earlier time, the dissipation of alcohol from the blood does not necessarily lead to the 'destruction' of BAC evidence. Rather, such evidence is destroyed only when so much alcohol has been removed from the bloodstream that retrograde extrapolation can no longer produce a reasonably accurate estimate of the suspect's BAC at the time he or she was driving."

*Ritz*, 270 Or App at 97-98.

In *Ritz*, we concluded that the state proved an "objectively reasonable belief" that, had the police waited for a warrant for over 90 minutes, the suspect's blood would have lost all evidentiary value because of proof that (1) more than four hours would have elapsed without any search warrant delay between the time of the accident to when the blood alcohol test would occur; (2) the police had acted as expeditiously as they could have; and (3) at the time of the search, the police officer was aware that the "average" dissipation rate is .015 percent BAC per hour. *Id.* at 99-101. Therefore, "[i]f police believed that it could take as long as 90 additional minutes to obtain a warrant (a reasonable estimation on this record), they could foresee a substantial possibility that defendant's BAC would have dropped from 0.08 (the threshold level for liability) to zero by the time it could be measured." *Id.* at 101.

In this case, the trial court found that Warner failed to make a comparable justification for the warrantless search. Warner testified that approximately 30 minutes had elapsed between the time that the 9-1-1 call was made and the time that entry to the house was effected and that he was "a little bit concerned about the time elapsed and the dissipation of the alcohol." In order to obtain a warrant, Warner stated that he would have to go to the police station, write a search warrant, find a judge, and go to the judge's home to obtain a signature. Warner was not aware of how long that would take because "I've never done a search warrant on a—on a house before." However, "I would imagine doing my—my first one, I would say it'd take probably at least three hours[.]" Warner later explained that the 90 minutes to obtain the search warrant for the blood draw would be "a little bit faster than trying to get one for a house."

The trial court determined that Warner's testimony about the length of time to obtain a warrant for the home search (three hours) was speculation:

> "The problem I have here is that the officer's own testimony was that he hadn't done one before and then so that—you know, I think that probably factored into why it would take a little longer, but the fact that he hadn't done one before and I'm just not really—I'm not persuaded by the testimony that it would take three hours to get a warrant here."

Because of that failure of proof, the court noted that it was "not persuaded that the option of getting a—a warrant was unreasonable based on the evidence" that had been presented.

Consistently with the trial court's determination that the time to obtain a search warrant to enter the home was not proved, the state failed to show that Warner had an objectively reasonable belief that a further delay of a specific length of time would occur and that a delay of that length would result in the loss of all evidentiary value for the drawn blood.

Accordingly, the trial court did not err in granting defendant's motion to suppress.

Affirmed.