804 March 5, 2015 No. 7

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

DINA LOUISE MAZZOLA,
*Petitioner on Review.*

(CC 101198M; CA A148224; SC S062126)

En Banc

On review from the Court of Appeals.*

Argued and submitted October 9, 2014, at La Grande High School, La Grande, Oregon.

Kyle Krohn, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was Peter Gartlan, Chief Defender.

Susan G. Howe, Senior Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

BREWER, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____
* Appeal from Josephine County Circuit Court, Pat Wolke, Judge. 260 Or App 378, 317 P3d 360 (2013).

**BREWER, J.**

A police officer stopped defendant for two traffic violations; in the course of the stop, the officer observed signs of intoxication and developed probable cause to arrest defendant for driving under the influence of one or more controlled substances. The officer then asked defendant to perform several field sobriety tests (FSTs). After performing them, defendant was arrested for controlled-substance DUII. ORS 813.010(1)(b).[1] Before trial, defendant moved to suppress the results of certain of the FSTs. The trial court denied that motion, and, on defendant's appeal from her ensuing conviction, the Court of Appeals affirmed. *State v. Mazzola*, 260 Or App 378, 317 P3d 360 (2013). The dispositive issue on review is whether, in denying defendant's motion to suppress, the trial court erred in concluding that exigent circumstances had existed that—when coupled with probable cause to arrest defendant for driving under the influence of a controlled substance—justified the warrantless administration of the FSTs under Article I, section 9, of the Oregon Constitution. *See State v. Nagel*, 320 Or 24, 30-33, 880 P2d 451 (1994) (FSTs are searches for which a warrant generally is required under Article I, section 9; an exception to the warrant requirement is "a search conducted with probable cause and under exigent circumstances").[2] For the reasons explained below, we affirm the ruling of the trial court and the decision of the Court of Appeals.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The pertinent facts are undisputed. Grants Pass police officer Lohrfink observed defendant's car turn and

---

[1] ORS 813.010(1) defines the crime of DUII and provides:

"(1) A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:

"(a) Has 0.08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person made under ORS 813.100, 813.140 or 813.150;

"(b) Is under the influence of intoxicating liquor, a controlled substance or an inhalant; or

"(c) Is under the influence of any combination of intoxicating liquor, an inhalant and a controlled substance."

[2] As discussed below, defendant does not assert that the officer lacked probable cause to arrest her for driving under the influence of a controlled substance before he asked defendant to perform the FSTs.

make a lane change without proper signaling. Lohrfink stopped defendant, approached her car, and asked for her driver's license and other paperwork. He noticed that defendant's speech was slurred, her eyes were glassy, her eyelids were droopy, and she was sweating. Defendant also had difficulty retrieving her driver's license from her wallet and fumbled her paperwork; she seemed to have difficulty understanding the officer's questions and made slow, methodical movements. Lohrfink did not detect any odor of alcohol.

Defendant handed a California identification card to Lohrfink. He asked her again for her driver's license, and she appeared confused, apparently thinking that she already had given it to him. Defendant then clarified that she was in the process of obtaining an Oregon driver's license. Lohrfink asked her about her slurred speech, and she initially denied—but later acknowledged—that her speech was slurred. Lohrfink asked defendant where she lived in California; she initially was uncertain and later said that she had just moved to Oregon.

After conducting that preliminary investigation, Lohrfink believed that he had probable cause to arrest defendant for driving under the influence of a controlled substance, but he did not know which drugs she might have taken. Lohrfink had two-and-a-half years' experience as a police officer and 15 years of experience as a paramedic; he had received training "about signs to look for" for drivers who are impaired by alcohol and controlled substances. Although Lohrfink was not trained as a Drug Recognition Expert (DRE), he was trained in the administration of FSTs. His paramedic training included "college level pharmacology courses, anatomy and physiology," and he had taught those courses to other paramedic students. Based on that training and experience, and his common knowledge, he knew the "basic" facts that "over time the body filters drugs and they dissipate in one's body," that different drugs dissipate at different rates, and that the effects of drugs wear off over time. Lohrfink also knew that controlled substances differ from alcohol in that drug metabolites remain in the body longer than alcohol and can be detected in a later urine test. However, he did not know "the specific science of that."

After concluding that he had probable cause to arrest defendant, Lohrfink asked, "[A]re you willing to step out so I can check your eyes and make sure you're okay to drive?"[3] Defendant said, "Okay." Lohrfink then asked defendant if she took any medications, and she said that she had a prescription for sleeping pills and also had taken Soma.[4] Lohrfink then administered the horizontal gaze nystagmus (HGN) test,[5] and he observed no "clues of impairment." Lohrfink was not surprised by the HGN test result, because that test does not detect the presence of certain medications and controlled substances. After administering the HGN test, Lohrfink said, "We're going to do a few more tests, okay?" Defendant responded, "Okay." She believed that Lohrfink was telling her what to do; when she agreed to perform the additional tests, she was "just doing what he told me to do." Lohrfink administered three additional FSTs: the walk-and-turn test, the one-leg-stand test, and the finger-to-nose test.[6] After administering those tests, Lohrfink arrested defendant for driving under the influence of a controlled substance.

Defendant filed a pretrial motion to suppress evidence obtained as a result of the traffic stop and DUII investigation. In her written motion and at the suppression hearing, defendant acknowledged that she had consented to the HGN test but asserted (1) that she did not actually consent to the three additional FSTs, and (2) that Officer Lohrfink

---

[3] When asked whether it would have been a hardship to obtain a search warrant before conducting the field sobriety tests, Lohrfink stated, "We don't do search warrants in this county." Lohrfink later clarified that he did not seek a search warrant before administering the FSTs "because we go based on DMV implied consent." *See* 356 Or at 820 n 15.

[4] "Soma," or Carisoprodol, is a central nervous system (CNS) depressant. *State v. McFarland*, 221 Or App 567, 571 n 3, 191 P3d 754 (2008).

[5] Officers look for nystagmus, that is, involuntary movement of the eye. There are three possible clues for impairment in each eye or a total of six possible clues. Four of six possible "clues" must be present for an individual to fail the HGN test. *See* OAR 257-025-0020 (describing FSTs and procedure); *see also State v. O'Key*, 321 Or 285, 294-95, 899 P2d 663 (1995) (describing nystagmus and HGN test).

[6] Lohrfink did not testify at the suppression hearing regarding the administration or results of the three additional FSTs. The FSTs that he administered were identified in defendant's written motion to suppress. *See Mazzola*, 260 Or App at 380. Because this case involves a conditional guilty plea, as opposed to the review of an evidentiary trial record, the court need not determine whether the admission of the FST results would have been harmful.

had lacked probable cause to believe that she had been driving under the influence of a controlled substance. At the close of the suppression hearing, defendant further argued that, even if there had been probable cause, the state had to prove that exigent circumstances existed, and it had failed to do so.

The trial court found that defendant had not actually consented to the administration of the three additional FSTs. However, the court concluded that Lohrfink had had probable cause to arrest defendant for driving under the influence of a controlled substance and that exigent circumstances existed. Accordingly, the court denied the motion to suppress.

Defendant entered a conditional guilty plea and appealed, challenging the denial of her motion to suppress. *Mazzola*, 260 Or App at 381. On appeal, defendant did not contest the trial court's determination that probable cause existed; rather, she focused solely on whether exigent circumstances supported the warrantless search. For its part, the state did not argue that defendant actually consented to the tests; instead, it, too, focused on the exigency issue. As noted, the Court of Appeals affirmed the trial court's ruling, holding that, in light of this court's decisions in *Nagel* and *State v. Machuca*, 347 Or 644, 227 P3d 729 (2010), "the evanescent nature of controlled-substance intoxication" created an exigency that—together with probable cause—permitted the warrantless administration of the challenged FSTs. *Mazzola*, 260 Or App at 382-83. In so concluding, the court emphasized that "the issue is whether the rate of dissipation of defendant's *physical, observable symptoms* of intoxication—that is, the type of evidence collected pursuant to a FST—created an exigency." *Id*. at 382 n 2 (emphasis in original).

On review, defendant argues that this court should not recognize an exigency that ordinarily authorizes the warrantless administration of FSTs where a police officer has probable cause to believe that a motorist is under the influence of a controlled substance. Defendant asserts that, unlike alcohol, the rates at which the effects of various controlled substances dissipate within the human body are

not matters of common knowledge. Defendant notes that, despite Lohrfink's training and experience as a police officer and paramedic, Lohrfink knew only the "basic" fact that the effects of drugs dissipate over time. Defendant asserts that the chemical dissipation rates of controlled substances can vary, depending both on the kind of drug and the kind of test involved, and that drug metabolites can remain in a person's system long after the effects of the drug have dissipated. Because the record contains no evidence of the dissipation rates for controlled substances that might have been in her body, defendant contends that the trial court could only speculate as to whether any significant loss of evidence might have occurred if Lohrfink had taken the time to seek a warrant to compel the administration of the challenged FSTs.[7]

The state responds that exigent circumstances generally are present when an officer reasonably believes that a motorist is under the influence of a controlled substance. According to the state, it is well known that the effects of drugs dissipate from a person's body, even if the particular rates of dissipation are not known or knowable at the roadside scene of a DUII arrest. Given the complexity of their metabolisms and the fact that controlled substances affect people in unpredictable ways, the state asserts that it is not possible to accurately determine how long a suspect would continue to be under the influence of a controlled substance. And, the state posits, when multiple drugs are involved, the reaction within a particular person's system is even more unpredictable. In addition, the state notes, there is no presumptive level of impairment that can be ascertained from

---

[7] In addition, defendant argues that, although common sense might suggest that FSTs detect impaired driving resulting from the ingestion of controlled substances, that is not so. According to defendant, FSTs are specifically designed to detect blood alcohol content, not the presence of controlled substances or general signs of impairment, and they have been validated only for that purpose.

That argument, however, is unpreserved. Defendant did not argue before the trial court that the challenged FSTs were not scientifically reliable indicia of impairment due to controlled substance intoxication. Had defendant raised that argument before the trial court, the state would have had an opportunity to make a different factual and legal record. *See, e.g.*, Marcelline Burns and Teresa Dioquino, *A Florida Validation Study of the Standardized Field Test (S.F.S.T.) Battery*, at Intro (1998) (asserting that "SFSTs provide important evidence of drug impairment"). Because the argument is unpreserved, we do not address it.

the presence of drugs in a suspect's blood stream or urine. Thus, the state reasons, the most probative evidence of drug impairment often is nonchemical evidence gathered close in time to the suspect's actual driving. The state asserts that requiring officers to weigh the length of time required to obtain a search warrant against the challenge of determining the dissipation rate of the effects of a suspected drug or combination of intoxicants will result in the loss of valuable evidence of impaired driving.

The Court of Appeals essentially agreed with the state's reasoning. Although the state did not present evidence about how long it would have taken for the officer in this case to obtain a warrant, the Court of Appeals concluded:

> "In *Machuca*, the Supreme Court observed that, as a general matter, 'the undisputed evanescent nature of alcohol in the blood' provides 'a sufficient basis to conclude that a warrant could not have been obtained without sacrificing that evidence.' 347 Or at 656 \*\*\*. We see no reason why that rule would not also apply to cases, like this one, involving FSTs, which are designed to enable officers to detect current impairment."

*Mazzola*, 260 Or App at 382-83. Defendant challenges that conclusion. In light of technological advances that have expedited a police officer's ability to seek a search warrant, and because the officer in this case did not consider (nor did the state establish) the dissipation rate of any controlled substances that she had ingested, defendant argues that no exigency existed that excused compliance with the warrant requirement of Article I, section 9.

## ANALYSIS

Article I, section 9, guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." Under that section, a search conducted without a warrant is deemed unreasonable unless it "fall[s] within one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988). One exception—the exigent circumstances exception—allows the police to conduct a search without a

warrant if the search is both supported by probable cause and conducted under exigent circumstances. *State v. Snow*, 337 Or 219, 223, 94 P3d 872 (2004). Exigent circumstances include, among other things, situations in which immediate action is necessary to prevent the disappearance, dissipation, or other loss of evidence. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991).

Where the exigent circumstances exception is at issue, this court has observed that, "[i]n this modern day of electronics and computers," a day will come when the warrant requirement can be fulfilled expeditiously. *State v. Brown*, 301 Or 268, 278 n 6, 721 P2d 1357 (1986); *see also State v. Kurokawa-Lasciak*, 351 Or 179, 188, 263 P3d 336 (2011) (discussing desirability of "a neutral magistrate's evaluation of probable cause" and anticipating "advances in technology permit[ting] quick and efficient electronic issuance of warrants"). In many circumstances, obtaining a warrant no longer entails undue delay or prevents timely police action. *See Riley v. California*, ___ US ___, ___, 134 S Ct 2473, 2493, 189 L Ed 2d 430 (2014) (discussing "[r]ecent technological advances" that have "made the process of obtaining a warrant itself more efficient"); *Missouri v. McNeely*, ___ US ___, ___, 133 S Ct 1552, 1573, 185 L Ed 2d 696 (2013) (Roberts, C.J., concurring in part and dissenting in part) (describing jurisdiction where warrants may be obtained electronically in as little as 15 minutes). We therefore are hesitant to broadly apply the exigent circumstances exception without a firm constitutional basis for doing so. *See State v. Fessenden / Dicke*, 355 Or 759, 771, 333 P3d 278 (2014) (so stating).

Although not argued as a basis for the administration of the tests in this case, a related exception to the warrant requirement under Article I, section 9, is the "search incident to arrest" doctrine. A warrantless search incident to arrest can be made for any of three purposes: (1) to protect a police officer's safety; (2) to prevent the destruction of evidence; or (3) to discover evidence of the crime of arrest. *State v. Hoskinson*, 320 Or 83, 86, 879 P2d 180 (1994). To pass constitutional muster, such a search must relate to a crime that there is probable cause to believe the arrestee

has committed, and it must be reasonable in scope, time, and intensity. *State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986); *State v. Caraher*, 293 Or 741, 758-59, 653 P2d 942 (1982). The doctrine exists because "[a]n arrest * * * creates a type of exigency justifying a warrantless search of the arrested person." *State v. Milligan*, 304 Or 659, 669, 748 P2d 130 (1988).[8] With the foregoing principles in mind, we turn to the statutory provisions and case law that are pertinent to our analysis.

Our point of departure is the DUII statute, ORS 813.010(1), which applies to driving under the influence of alcohol, controlled substances, inhalants, or a combination of any of those intoxicants. As this court explained in *State v. Eumana-Moranchel*, 352 Or 1, 7-8, 277 P3d 549 (2012):

> "The state can establish that the defendant's [blood alcohol content (]BAC[)] was .08 percent or more, ORS 813.010(1) (a), regardless of observable symptoms, or the state can prove that the person was 'under the influence of intoxicating liquor, a controlled substance, or an inhalant,' that is, that the defendant was adversely affected by intoxicants to a perceptible degree, ORS 813.010(1)(b), (c). *See* [*State v.*] *King*, 316 Or [437,] 446[, 852 P2d 190 (1993)] ('The legislature did intend that a person could commit [the offense of DUII] by driving with the specified BAC but with no perceptible impairment or by driving with a legally permissible or unknown BAC but while nonetheless perceptibly impaired[.]'); [*State v.*] *Clark*, 286 Or [33,] 39[, 593 P2d 123 (1979)] (in making it an offense to drive with a certain BAC, 'the legislature apparently assumed, based on scientific studies and medical knowledge, that the physical and mental condition of a driver with such a level of blood alcohol is impaired to such a degree as to make it unsafe for him to drive a motor vehicle, regardless of observable physical symptoms')."

Thus, the state must prove (1) in the case of alcohol intoxication, that the driver had a proscribed BAC level, ORS

---

[8] A search incident to arrest may precede the arrest, where, as here, the defendant was subject to restraint when the search occurred. *State v. Heintz*, 286 Or 239, 248, 594 P2d 385 (1979); *State v. Groda*, 285 Or 321, 325, 591 P2d 1354 (1979). However, "probable cause for an arrest [must] exist[] independently of evidence brought to light by the search." *State v. Elk*, 249 Or 614, 621-22, 439 P2d 1011 (1968).

813.010(1)(a); or (2) alternatively in alcohol cases, and necessarily in controlled substance, inhalant, and combined intoxication cases, that the driver was impaired to a perceptible degree while driving, ORS 813.010(1)(b), (c).[9] Implicit in ORS 813.010(1)(a) is the premise that, in an alcohol-based prosecution, blood alcohol content is probative of whether a defendant was impaired while driving. By contrast, the DUII statute does not provide that chemical evidence of the presence of drugs in a defendant's system can establish that the defendant was so impaired.[10] Thus, in a prosecution under ORS 813.010(1)(b), evidence that the defendant was impaired while driving typically comes in other forms. With that basic framework in mind, we turn to the case law on which the parties rely.

The parties primarily focus on two prior decisions in which this court applied the exigency exception, both of which involved alcohol intoxication. In *Nagel*, an officer administered FSTs to the defendant and arrested him for an alcohol-based DUII after completing the tests. 320 Or at 26-27. The trial court denied the defendant's motion to suppress evidence derived from the FSTs. *Id*. at 27-28. On review, this court concluded that the administration of

_____

[9] Of course, to convict a defendant of controlled substance-based DUII under ORS 813.010(1)(b), the state also must prove that the impairment was *due to* the influence of a controlled substance. Although that element is not our main point of focus here, we note that such proof often is adduced through post-arrest chemical urinalysis showing the presence of a controlled substance in the defendant's body. *See, e.g.*, *State v. Fong*, 226 Or App 493, 499, 204 P3d 146 (2009) (referring to urinalysis evidence adduced to prove that impaired driving was due to the influence of a controlled substance). As another way to prove that a motorist is impaired *due to* controlled substance intoxication, some courts, including the Court of Appeals, have approved the admission as scientific evidence of the results of a twelve-step drug recognition protocol that includes, among other features, the administration of a BAC test, various FSTs, and, ultimately for validation purposes, a chemical urinalysis test for the presence of controlled substances. *See* *State v. Sampson*, 167 Or App 489, 493-96, 6 P3d 543, *rev den*, 331 Or 361 (2000) (citing NHTSA, "Drug Evaluation and Classification Training Student Manual," at IV-3 to IV-22 (1993)); *see also* OAR 257-025-0012(3) (noting the existence of the same).

[10] That difference in the statutory treatment of alcohol-based and controlled substance-based DUIIs is consistent with the premise that "[c]hemical tests of blood or urine usually disclose only whether or not a particular drug was recently used. The chemical test cannot be relied upon to determine whether the drug was psychoactive in the subject at that time." NHTSA, "Drug Evaluation and Classification Training: 'The Drug Recognition Expert School' Student Manual," at III-4 (Jan 2011 ed) (emphasis omitted).

FSTs was a search under both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution, but that the warrantless search was reasonable based on the exigent circumstances exception. *Id.* at 28-37. This court noted that "[b]lood-alcohol content is a transitory condition, the evidence of which will dissipate in a relatively short time." *Id.* at 33. Because evidence of impairment due to alcohol intoxication that could be obtained from FSTs may be sacrificed during the time required to obtain a search warrant, the court concluded that exigent circumstances justified the warrantless administration of FSTs under Article I, section 9. *Id.*

In *Machuca*, the defendant was involved in a car accident and taken to a hospital emergency room. 347 Or at 646. A police officer responded. There was a strong odor of alcohol in the room. The officer arrested the defendant, read an "implied consent rights and consequences" form, and asked if the defendant would "like to" take a blood test. *Id.* at 647. The defendant agreed, and the officer summoned a nurse who extracted a sample of the defendant's blood. *Id.*

Before his DUII trial, the defendant moved to suppress the results of the blood test under Article I, section 9. *Id.* The state argued that the dissipating amount of alcohol in the defendant's bloodstream constituted an exigency that, when coupled with probable cause to believe that the defendant had driven while intoxicated, excused the warrant requirement. *Id.* This court upheld the trial court's denial of the suppression motion. *Id.* at 659. As pertinent here, the court reviewed its prior decisions involving warrantless blood draws for the purpose of investigating DUIIs, including *State v. Moylett*, 313 Or 540, 836 P2d 1329 (1992).

In *Moylett*, evidence showed that "[t]he loss of alcohol evidence which creates the exigency occurs because of the biological fact that the human body metabolizes and expels alcohol." 313 Or at 550. This court had held that the mere fact that alcohol was dissipating was insufficient to establish an exigency. Instead, the court had concluded that the state was further required to prove that a warrant could not have been expeditiously obtained to authorize the warrantless extraction. *Id.* at 551. Specifically, the court had stated:

"The exigency created by the dissipating evidence of blood alcohol, however, did not make the blood sample seizures *per se* reasonable under Article I, section 9. The state was still required to prove, in order to justify the warrantless extraction of defendant's blood, that it could not have obtained a search warrant without sacrificing the evidence and that the blood sample that it obtained had been extracted promptly."

*Moylett*, 313 Or at 550-51 (internal quotations omitted).

This court, in *Machuca*, expressly disavowed that portion of *Moylett*:

"After examining the cases set out above, we conclude that the exigent circumstances analysis set out in *Moylett*, which required the state to prove 'that it could not have obtained a search warrant without sacrificing the evidence,' unnecessarily deviated from this court's established case law. Until *Moylett*, the court's focus had been on the exigency created by blood alcohol dissipation. *Moylett*, however, shifted that focus away from the blood alcohol exigency itself and onto the speed with which a warrant presumably could have issued in a particular case. In our view, that shift was unsupported by the cases that preceded it, and we disavow it now."

*Machuca*, 347 Or at 656. With that treatment of the case law, the court in *Machuca* announced the following rule in the warrantless blood-draw context:

"It may be true, phenomenologically, that, among such cases, there will be instances in which a warrant could have been both obtained and executed in a timely fashion. The mere possibility, however, that such situations may occur from time to time does not justify ignoring the inescapable fact that, in every such case, evidence is disappearing and minutes count. We therefore declare that, for purposes of the Oregon Constitution, the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will ordinarily permit a warrantless blood draw of the kind taken here. We do so, however, understanding that particular facts may show, in the rare case, that a warrant could have been obtained and executed significantly faster than the actual process otherwise used under the circumstances.

> We anticipate that only in those rare cases will a warrant-
> less blood draw be unconstitutional."

*Id.* at 656-57 (emphasis omitted).[11]

As discussed, *Nagel* and *Machuca* both involved suspected alcohol intoxication. In particular, in assessing exigency, *Nagel* weighed the amount of time necessary to obtain a warrant against the known dissipation rate of alcohol in a person's bloodstream. That comparison is less apt where, as here, defendant's prosecution was not based on ORS 813.010(1)(a). That is, unlike the alcohol-based prosecutions in *Nagel* and *Machuca*, the claimed exigency in this case did not involve obtaining evidence of impairment in

---

[11] Defendant does not rely on the Fourth Amendment in this case. However, we note that, in *McNeely*, the United States Supreme Court addressed "whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." *McNeely*, ___ US at ___, 133 S Ct at 1556. The court concluded:

"In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."

*Id.* at ___, 133 S Ct at 1561. In reaching that conclusion, the Court recognized that advances in technology and procedure now allow officers—often coordinating with prosecutors and the court—to obtain warrants in an expedited fashion. *Id.* at ___, 133 S Ct at 1561-62. Moreover, circumstances may indicate that "an officer can take steps to secure a warrant while the suspect is being transported." *Id.* at ___, 133 S Ct at 1561. "In such a circumstance, there would be no plausible justification for an exception to the warrant requirement." *Id.*

As the state points out, *McNeely* addressed the narrow issue of whether the natural dissipation of alcohol in the body creates a *per se* exigent circumstance that justifies a nonconsensual and warrantless blood draw from a driver after transport from the scene of arrest. *See id.* at ___, 133 S Ct at 1558; *cf. State v. Moore*, 354 Or 493, 497 n 5, 318 P3d 1133 (2013), *adh'd to as modified on recons*, 354 Or 835, 322 P3d 486 (2014) ("In our view, the Court's rejection [in *McNeely*] of a *per se* exigency rule is not inconsistent with our statement in [*Machuca*] that, while exigent circumstances are 'ordinarily' present in a case involving alcohol, that may not be true, depending on the facts of a particular case."). In *McNeely*, the Court did not address the application of the exigency exception in the context of the warrantless administration of FSTs at the scene of a DUII arrest. We also note that, since deciding *McNeely*, the Court has taken a more lenient view of the demands of the warrant requirement under the Fourth Amendment where less intrusive searches than blood draws are involved. *See, e.g.*, *Maryland v. King*, ___ US ___, ___, 133 S Ct 1958, 1968-69, 186 L Ed 2d 1 (2013) (DNA buccal swab procedure conducted at a police station was "a far more gentle process than a venipuncture to draw blood," and did not require a warrant because it was a reasonable search). In short, *McNeely* is not controlling here, and defendant does not contend otherwise.

the form of a quantitative chemical analysis of defendant's bodily fluids; rather, as elaborated below, the claimed exigency involved securing observational evidence of a motorist's physical impairment due to the use of controlled substances. As an additional distinction, *Machuca* involved a compelled blood draw at a medical facility rather than the administration of FSTs at the roadside scene of a DUII investigation. Different considerations apply to the exigency analysis where the challenged search occurred relatively late in a DUII investigation and more time was available to secure a warrant. Accordingly, while instructive, *Nagel* and *Machuca* do not wholly control our assessment of exigency in the context of the roadside administration of FSTs in a controlled substance intoxication investigation.[12]

Which brings us to defendant's challenge on review. According to defendant, "unlike alcohol, the dissipation of controlled substances from the body is neither well-established nor common knowledge." Defendant asserts that, although scientific studies have established a correlation between the amount of alcohol in a person's system and the extent of the person's impairment, the same is not true for controlled substances. Defendant notes that some drugs have a quicker onset of effect than others, some have a more durable effect than others, and the toxicological evidence of some remains in the system longer than others, sometimes even long after the impairing effects have subsided.[13] It follows, defendant concludes, that the trial court could only speculate as to whether any loss of evidence might have occurred if Lohrfink had sought a search warrant for evidence of controlled substances.

---

[12] In *Moore*, also a controlled substance intoxication case, this court briefly noted that the record contained "no evidence of the dissipation rates for any controlled substances that might have been found in defendant's system." 354 Or at 497 n 5. However, our decision in that case involved the consent exception to the warrant requirement, not the exigency exception. *Id.* at 495-97. *Moore* does not meaningfully inform our analysis here.

[13] The state does not dispute—to the contrary, it strongly agrees—that those variations and uncertainties exist. In fact, both parties have provided the court with extensive references to scientific studies that generally reach similar conclusions. However, those materials were not presented to the trial court at the suppression hearing. To the extent that they include adjudicative facts, we have not been asked to take judicial notice of those facts, *see* OEC 201(f) (providing for judicial notice at trial or on appeal), nor, in view of our analysis, is it necessary for us to do so *sua sponte*.

To properly assess defendant's argument, it is helpful to consider the purpose for which FSTs are relevant in DUII prosecutions under ORS 813.010(1)(b). The rationale behind the admission in DUII cases of the results of FSTs such as the ones challenged here aptly has been described as follows:

> "Psychomotor [field sobriety tests] test balance and divided attention, or the ability to perform multiple tasks simultaneously. While balancing is not necessarily a factor in driving, the lack of balance is an indicator that there may be other problems. Poor divided attention skills relate directly to a driver's exercise of judgment and ability to respond to the numerous stimuli presented during driving. The tests involving coordination (including the walk-and-turn and the one-leg-stand) are probative of the ability to drive, as they examine control over the subject's own movements."

*United States v. Horn*, 185 F Supp 2d 530, 558 (D Md 2002). That is, the challenged FSTs test for, and provide evidence of, impaired driving. Consistently with that rationale, ORS 801.272 defines "field sobriety test" as:

> "[A] physical or mental test, approved by the Department of State Police by rule after consultation with the Department of Public Safety Standards and Training, that enables a police officer or *trier of fact to* screen for or *detect probable impairment* from intoxicating liquor, a controlled substance, an inhalant or any combination of intoxicating liquor, an inhalant and a controlled substance."

(Emphasis added). Thus, the legislature has defined "field sobriety test" as a means of detecting impairment.[14]

As discussed, ORS 813.010(1)(b) sets out an alternative way to prove an alcohol-based DUII, but it provides the only way to prove a controlled substance DUII. *See Eumana-Moranchel*, 352 Or at 7-8. An element of ORS 813.010(1)(b) is driving while impaired; to prove that element, the most probative evidence generally will consist of observations made while—or close in time after—the defendant was

---

[14] The Department of State Police has adopted administrative rules pursuant to ORS 801.272 that set out the FSTs, OAR 257-025-0000 to 257-025-0025. OAR 257-025-0012, which sets out approved field sobriety tests (including the tests that defendant challenges in this case), provides that those tests are "'field sobriety tests' as that phrase is defined by ORS 801.272."

driving. *See id.* at 7 ("the focus of [ORS 813.010(1)(b)] is on the act of driving, and doing so while impaired"). Thus, FST evidence—like any other observed evidence of impairment—that is gathered closest in time to the defendant's act of driving, will be most probative.

To further assess defendant's argument, we also consider the implications of the unchallenged conclusion that Officer Lohrfink already had probable cause to arrest defendant for the crime of driving under the influence of a controlled substance when he asked her to perform the FSTs at issue here. In *Heintz*, this court held that, if probable cause to make a DUII arrest exists, if the search at issue involves a limited intrusion (a blood draw), and if evidence of the crime under investigation is evanescent, then no warrant is required to justify the search as one incident to the defendant's arrest. *Heintz*, 286 Or at 248-49. In *Milligan*, relying in part on *Heintz*, this court held that, where probable cause to arrest the defendant existed, a warrantless blood draw at a hospital did not violate Article I, section 9. *Milligan*, 304 Or at 665. In the circumstances there, the court held that the defendant "was a vessel containing evidence of a crime he had committed—evidence that was dissipating with every breath he took." *Id.* at 665. The court further held that the exigency requirement did not demand evidence showing the amount of time that would have been lost in obtaining a warrant. *Id.* According to the court,

> "this legal conclusion asks too much of the evidence. From the testimony the trial court accepted, exigent circumstances existed justifying the initial, warrantless extraction because alcohol was dissipating at some significant rate."

*Id.* at 666 n 5 (emphasis omitted). In *Machuca*, which, like this case, involved the application of the exigent circumstances exception, this court drew on both *Milligan* and *Heintz* to support its conclusion that an exigency justified the warrantless blood draw in that case. *Machuca*, 347 Or at 652-55.

As pertinent here, *Mulligan*, *Heintz*, and *Machuca* teach us that, where a warrantless search for evidence of the crime of DUII is supported by probable cause to arrest the

defendant, the issue of exigency should be assessed in light of the reasonableness of the search in time, scope, and intensity. Here, limited testing designed to detect evidence of current impairment was performed on a person who already had been validly stopped and also was subject to arrest for DUII. The tests at issue were limited in scope and intensity; they did not intrude into defendant's body; rather, they assessed her coordination, balance, and motor skills. Those tests constituted probative evidence of an element—current impairment—of the crime of defendant's arrest, they were administered soon after defendant had been observed driving, and they immediately preceded her arrest. With respect to exigency, there also was evidence that "over time the body filters drugs and they dissipate in one's body," that various drugs can dissipate at different rates, and that the effects of drugs wear off over time. Again, the challenged FSTs assess a motorist's impairment at the time of driving, not at a later time. *See Eumana-Moranchel*, 352 Or at 7. In light of the limited scope and intensity of those tests, and their proximity in time to defendant's arrest, the described evidence established a sufficient exigency to justify the warrantless administration of the FSTs in this case.

## CONCLUSION

We conclude that, because defendant was subject to arrest for DUII, and because the administration of the challenged FSTs was reasonable in time, scope, and intensity, the evidence of exigent circumstances in this case was sufficient to make the warrantless administration of those tests constitutionally permissible.[15] Accordingly, we affirm

---

[15] As noted, Officer Lohrfink testified that he relied on "implied consent" in this and other DUII cases. Our holding makes it unnecessary to consider the state's alternative argument that defendant impliedly (as opposed to actually) consented to the administration of the FSTs under ORS 813.135. That statute provides:

"Any person who operates a vehicle upon premises open to the public or the highways of the state shall be deemed to have given consent to submit to field sobriety tests upon the request of a police officer for the purpose of determining if the person is under the influence of intoxicants if the police officer reasonably suspects that the person has committed the offense of driving while under the influence of intoxicants in violation of ORS 813.010 or a municipal ordinance. Before the tests are administered, the person requested to take the tests shall be informed of the consequences of refusing to take or failing to submit to the tests under ORS 813.136."

the trial court's denial of defendant's motion to suppress and the Court of Appeals decision affirming that ruling.[16]

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

ORS 813.136, in turn, provides:

> "If a person refuses or fails to submit to field sobriety tests as required by ORS 813.135, evidence of the person's refusal or failure to submit is admissible in any criminal or civil action or proceeding arising out of allegations that the person was driving while under the influence of intoxicants."

ORS 813.135 and ORS 813.136, taken together, create a limited implied exclusionary rule that, "if the driver refuses the tests and no information concerning the consequences of refusing was given, evidence of refusal is not admissible." *State v. Trenary*, 316 Or 172, 178, 850 P2d 356 (1993) (emphasis omitted).

The record in this case does not show that Officer Lohrfink warned defendant of the consequences of refusing to submit to the FSTs. However, the statutes do not provide for the exclusion of evidence if a driver takes the field sobriety tests without being informed of the consequences because, in that instance, "the goal of the statute—that suspected DUII drivers perform field sobriety tests—has been achieved." *Id.* Therefore, "[t]he statute is directed at drivers who refuse to take the test, not at drivers who do take the test." *Id.* at 177.

[16] Our holding also makes it unnecessary to address the state's additional alternative argument that the warrantless administration of FSTs when an officer has reasonable suspicion to believe a motorist has committed the crime of driving under the influence of intoxicants constitutes a reasonable search for purposes of Article I, section 9. In *Nagel*, this court expressly abstained from deciding whether ORS 813.135—which authorizes FSTs based on reasonable suspicion—violates Article I, section 9. *Nagel*, 320 Or at 37.