Submitted July 24, 2014, affirmed March 25, petition for review allowed July 9, 2015 (357 Or 550)

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**RANDALL RAY RITZ,**
*Defendant-Appellant.*

Curry County Circuit Court
11CR1068; A152111

347 P3d 1052

Peter Gartlan, Chief Defender, and Jonah Morningstar, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Joanna L. Jenkins, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

## GARRETT, J.

A jury convicted defendant of driving under the influence of intoxicants (DUII), ORS 813.010, and driving while suspended, ORS 811.182. The issue on appeal is whether police violated defendant's constitutional rights when they forcibly entered his home, without a warrant, in order to apprehend defendant and obtain evidence of his blood alcohol level. The trial court ruled that the warrantless entry was permissible under the circumstances, which included defendant's evasion of police before returning to his residence. We affirm.

The relevant facts are undisputed. At approximately 10:15 p.m., police received a dispatch report that a man and a woman were fighting in a driveway near a vehicle that had crashed into a ditch. At approximately 10:30 p.m., Detective McCourt of the Brookings Police Department arrived at the scene. Deputy Lorentz of the Curry County Sheriff's Office also arrived shortly after. Police observed a white truck in a ditch in close proximity to a driveway. A woman, Wilson-McCullough, was at the scene. Her statements to Lorentz established that she lived at the residence with defendant, who had driven the truck and had been drinking that day. Wilson-McCullough accompanied Lorentz up the driveway to the residence, a small trailer, to look for defendant. Wilson-McCullough opened the door, and Lorentz looked through the door. Lorentz could see the whole trailer through the door and did not see defendant. Lorentz heard what sounded like someone running through nearby bushes, but he could not locate anyone there, either.

Lorentz returned to the crash site, where State Trooper Spini had arrived. McCourt had concluded that the truck was owned by a third party, Zimmerman. McCourt then left the scene and went to Zimmerman's residence. McCourt interviewed Zimmerman, who confirmed that he owned the truck and had seen defendant driving it about 45 minutes earlier. Zimmerman said that defendant was driving unsafely and had damaged property. He said defendant was "slumped over" in the truck and appeared to be intoxicated. At some point, Lorentz also arrived at Zimmerman's residence and took further statements from Zimmerman. At

about 11:30 or 11:45 p.m., Spini took control of the investigation, and McCourt and Lorentz left. Spini waited slightly longer in case defendant returned. Spini left at about 11:50 p.m.

Spini returned to the trailer residence at 12:56 a.m. As he was pulling up, he saw defendant standing just outside the trailer, near the door. Seconds later, defendant went inside and closed the door. He briefly stuck his head out the door, then closed it again. Spini called out to defendant to ask him to come outside. At 1:05 a.m., Spini called Lorentz to report that he had seen defendant enter the residence. Lorentz returned to the scene at 1:12 a.m. At Spini's request, several Brookings police units also arrived to provide assistance. Together, the law enforcement officers formed a perimeter around the trailer and had a full view of all sides, including potential exit points.

Lorentz and Spini decided that they needed to act quickly. Lorentz later testified that obtaining a telephonic warrant in Curry County takes approximately 45 minutes. Spini testified that he could have used his "in-car computer" to prepare a warrant application at the scene. Nevertheless, he estimated that it would have taken 90 minutes to prepare the warrant application, and then slightly longer to actually obtain the warrant. The trial court found that testimony credible. Spini testified that he decided not to apply for a warrant because he was concerned about the loss of evidence due to the dissipation of alcohol in defendant's bloodstream; thus, he believed that an exigency existed such that no warrant was required. Lorentz also testified that they wanted to minimize the time that the Brookings officers were at the scene because those officers were out of their jurisdiction and needed to return to their normal duties.

The trailer door was locked. Lorentz entered the trailer through a window, then opened the door for Spini. Defendant was in the bathroom. After some conversation, defendant agreed to come out of the bathroom. The officers detected an "overwhelming odor" of alcohol. Defendant had bloodshot, watery eyes, slurred speech, and was naked. Spini arrested him at 1:33 a.m. Defendant was transported to the Curry County Jail. Defendant made incriminating

statements, and a breath test administered at 2:23 a.m. showed that defendant had a blood alcohol concentration (BAC) level of 0.14 percent.

Before trial, defendant moved to suppress evidence obtained after the warrantless entry into his home. He argued that the entry was unlawful, and that his statements and the BAC evidence were required to be suppressed because of the illegality. The state argued that the entry was lawful based on probable cause and exigent circumstances. The state also argued that the entry was justified because, when defendant retreated into the interior of his trailer, police were allowed to follow him inside because they were in "hot pursuit." The trial court denied defendant's motion, concluding:

> "First, in regards to the entry to defendant's home, defense argues that delay would have allowed time to get a warrant. However, the officers had reason to believe that the defendant was not in the trailer early on in the investigation and, in fact, it wasn't until Trooper Spini arrived later on in the evening, after returning, that he saw defendant go into the trailer. That's the first time that the officers had reason to believe or probable cause to believe that the defendant was inside the trailer. In fact, it was more likely than not prior to that time that the defendant, while the officers were there at least, the defendant was not in the trailer. The officers had reason to believe, and it was more likely than not, that the defendant had fled on foot down the trail.

> "So it was really only a very short period of time after that probable cause to believe that the defendant was in the trailer was developed that the officers went in and got the defendant. It was not a long period of time. It's true that the officers much earlier on had developed probable cause to believe that the defendant had committed the offense of driving under the influence; however, they could hardly be expected to seek a warrant to go into the trailer when they know that the defendant has almost certainly fled on foot and is not in the trailer and a warrant would not have been granted under those circumstances at that time.

> "The officers did have probable cause to believe that defendant had committed the offense of driving under the influence prior to the entry into the trailer. Shortly before

the entry the officers had probable cause to believe that he was in the trailer and that evidence of DUII might be obtained by sample of blood or breath. * * *

"Exigent circumstances and hot pursuit both provide a valid basis for entry into the trailer without a warrant in this case. Additionally, the officers had safety concerns because the Brookings officers, who were providing back-up, would have to stay a much longer period of time to provide back-up in the event that a warrant was sought, leaving them unavailable to patrol in the city of Brookings, which is where they ordinarily work. * * * Officer safety concerns compelled those Brookings officers to stay on scene until the arrest was effected, so this was an additional exigent circumstance."

Defendant was convicted of DUII and driving while suspended.

On appeal, defendant assigns error to the denial of his motion to suppress. He argues that the warrantless entry violated his rights under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. The state renews its arguments that the warrantless entry was permissible because of the exigency of the circumstances and under the hot pursuit exception.

When reviewing a denial of a motion to suppress, we are bound by the facts found by the trial court that are supported by evidence in the record. *State v. Marshall*, 254 Or App 419, 421, 295 P3d 128 (2013). Whether those facts describe circumstances that justify a warrantless search or seizure is a question of law. *State v. Dahl*, 323 Or 199, 205, 915 P2d 979 (1996). Both Article I, section 9, and the Fourth Amendment protect persons against unreasonable searches by police. The cases construing those provisions have held that a warrantless search is *per se* unreasonable unless the search falls within one of the "few specifically established and well-delineated exceptions" to the warrant requirement. *Katz v. United States*, 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967); *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011). One exception to the warrant requirement is the so-called "exigency" exception. For purposes of the Oregon constitution, exigent circumstances are those that

"'require the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence,' [*State v.*] *Stevens,* 311 Or [119, 126, 806 P2d 92 (1991)], while the federal courts have similarly stated that exigent circumstances 'are present when a reasonable person would believe that entry * * * was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' *United States v. Alaimalo,* 313 F3d 1188, 1192-93 (9th Cir 2002), *cert den,* 540 US 895 (2003)."

*State v. Miskell/Sinibaldi,* 351 Or 680, 696, 277 P3d 522 (2012) (original brackets omitted).

The parties focus on whether the warrantless entry into defendant's home was justified by the exigency of the circumstances. As explained below, we agree with the trial court that exigent circumstances existed in this case. Because we affirm the trial court's ruling on that ground, we need not address the other justifications—officer safety and hot pursuit—cited by the trial court and the state.

We begin, however, by noting that the state's principal argument fails. That argument is that the gradual dissipation of defendant's BAC created the type of near *per se* exigency described in *State v. Machuca,* 347 Or 644, 227 P3d 729 (2010). In *Machuca,* the defendant was in a car accident and was hospitalized. *Id.* at 646. A police officer responded, arrested the defendant at the hospital, and obtained a draw of the defendant's blood. *Id.* at 646-47. The defendant sought to suppress the evidence on the ground that no warrant had issued. The Supreme Court held that "the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will ordinarily permit a warrantless blood draw of the kind taken here." *Id.* at 657.

In this case, the state argues that *Machuca* establishes that police were justified in immediately entering defendant's home without a warrant in order to prevent the loss of blood-alcohol evidence. But *Machuca* does not reach that far. In *State v. Sullivan,* 265 Or App 62, 78, 333 P3d 1201 (2014), which was decided after briefing in this case, we noted that *Machuca* dealt with "the context of limited

testing that is specifically designed to detect impairment, performed on a defendant who has already been validly seized as a prelude to that testing." We declined to extend *Machuca* to a "fundamentally different type of government intrusion, a home entry." *Id.* Citing the "substantial burden that the state faces when it attempts to justify a warrantless home entry," we reasoned that the near "per se" rule established in *Machuca* was inapplicable. Thus, in light of *Sullivan*, the state is incorrect that the home entry in this case was permissible under *Machuca*.

Sullivan is also consistent with *State v. Mazzola*, 356 Or 804, 345 P3d 424 (2015), in which the Oregon Supreme Court provided more context for its holding in *Machuca*. In *Mazzola*, the court concluded that, "where a warrantless search for evidence of the crime of DUII is supported by probable cause to arrest the defendant, the issue of exigency should be assessed in light of the reasonableness of the search in time, scope, and intensity." *Id.* at 819-20. The court went on to note that *Machuca*, and the cases on which it relied, involved warrantless blood draws. The court has characterized that type of search as "limited intrusion." *Id.* at 819. For example, in *State v. Heintz*, 286 Or 239, 248, 594 P2d 385 (1979), the court approvingly quoted *Schmerber v. California*, 384 US 757, 771, 86 S Ct 1826, 16 L Ed 2d 908 (1966), and characterized "the taking of a blood sample 'in a hospital environment' as a 'minor intrusion *** under stringently limited conditions[.]'" By contrast, a person's privacy interest in his home is extreme. *State v. Fair*, 353 Or 588, 600, 302 P3d 417 (2013). Indeed, the Supreme Court has held that "'[n]othing is more personal or private'" and "'[n]othing is more inviolate'" than the home. *Id.* (quoting *State v. Tourtillott*, 289 Or 845, 865, 619 P2d 423 (1980)). Consequently, "appellate case law has consistently reflected the substantial burden that the state faces when it attempts to justify a warrantless home entry." *Sullivan*, 265 Or App at 79.

Thus, in cases involving the warrantless entry into a home, our analysis turns on an examination of whether a warrant could reasonably have been obtained without sacrificing evidence of the crime of DUII. *Id.* at 81. The crime of DUII is defined by ORS 813.010, which provides that the offense may be proved by showing that a person

drove a vehicle while that person had "0.08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood." ORS 813.010(1)(a). Alternatively, the state may prove the crime of DUII by introducing other evidence that a person drove while "under the influence of intoxicating liquor, a controlled substance or an inhalant." ORS 813.010(1)(b). Either way, the ability to perform chemical tests that reveal a suspect's BAC is often critical to a successful prosecution.

That does not mean, however, that exigent circumstances will necessarily exist whenever police suspect a person has committed the crime of DUII. In *State v. Roberts*, 75 Or App 292, 296, 706 P2d 564 (1985), we explained that

> "[b]ecause of the peculiar nature of the DUII offense, defendant's personal condition and, therefore, his person are evidence. In some circumstances, the need to secure that evidence of the crime of DUII—defendant's body—might justify a warrantless entry of a home, *if the state proves that the arresting officers could not have obtained a warrant before the alcohol in the suspect's body dissipated.*"

(Emphasis in original.) In *Roberts*, testimony by the officers who entered the defendant's residence established that they "did not really know how long it would take to get a warrant." *Id*. Because the state failed to produce "credible evidence of the length of time necessary to obtain a warrant[,]" we concluded that the state had failed to carry its burden to prove exigency. *Id*. at 297. Likewise, in *State v. Kruse*, 220 Or App 38, 43, 184 P3d 1182 (2008), officers were able to testify only that obtaining a warrant would have taken a "very lengthy" time. We cited the rule from *Roberts*—that the state must prove that they "could not have obtained a warrant before the alcohol in the suspect's body dissipated"—and determined that the state had failed to prove exigency. *Id*. at 47 (citing *Roberts*, 75 Or App at 296).

More recently, we have reiterated the basic point made in both *Roberts* and *Kruse*. In *Sullivan*, we explained that the biological process by which alcohol is gradually eliminated from the blood stream is fundamentally different from other situations in which the destruction of critical evidence is imminent, 265 Or App at 80. We reasoned that,

> "[i]n some cases, it is easy to identify the circumstance that creates the demand for immediate police action: drugs may be flushed down the toilet or a forged document may be burned in a relative instant. That is not so where a suspect's intoxication is the potential evidence sought; depending on the time that the warrant would have taken to obtain, the alcohol in the bloodstream might have dissipated entirely, not at all, to a degree that impaired the efficacy of testing, or to a degree that had no material effect. Given that range of possibilities, the one thing that is certain is that a *sine qua non* to determining the necessity of an *immediate* home entry is some showing as to how long it would have taken to obtain a warrant under the circumstances."

*Id.* (emphasis in original). We then agreed with the trial court that the state had failed to make that showing because it introduced no evidence "that a warrant could not have been swiftly obtained by the traditional approach of an officer to a judge." *Id.* at 65, 80.

In a case also decided today, *State v. Rice*, 270 Or App 50, 55-56, 346 P3d 631 (2015), we reasoned that "to justify a warrantless entry into a residence under the doctrine of exigent circumstances, the state has the burden to prove that the time it would have taken to obtain a warrant would have sacrificed evidence." In *Rice*, off-duty police officers reported that defendant appeared to be driving while intoxicated. 270 Or App at 51-52. That report was made around 11:00 a.m. on a Sunday. *Id.* at 52, 53. When police later talked to the defendant at his home, the defendant admitted to having driven earlier in the day and appeared to still be intoxicated. *Id.* at 52. He refused, however, to come outside and perform field sobriety tests. Shortly after 11:40 a.m., police broke down the defendant's door and arrested him. *Id.* at 53. Police later testified that they had not considered getting a warrant, and speculated that it might have been difficult to reach a judge on a Sunday. *Id.* at 53. The trial court agreed and found that the "availability of a judge to review a search warrant on a Sunday at 11 a.m. is speculative[.]" (Brackets in original omitted.) We reversed and remanded, concluding that "[b]ased on the trial court's findings," the state had failed to prove that it could not have obtained a warrant without sacrificing evidence. *Id.* at 56.

Thus, each of those four cases reinforces the same basic rule: before entering a suspect's home, the state has the burden of proving exigency by showing that critical evidence would have been lost if police had waited to obtain a search warrant. None of those cases, however, actually analyzed whether a particular set of circumstances justified the warrantless search at issue. That is because, in each case, the state failed to make any showing as to how long it would have taken to obtain a search warrant. In this case, by contrast, Lorentz testified that a telephonic warrant can take at least 45 minutes, and Spini testified that it can take twice that long just to prepare the warrant application. The trial court found that testimony to be credible, and that finding is supported by the record. Rather than simply speculating that a judge might not be available, Spini and Lorentz testified about how long it would take *the police* to prepare to apply for a warrant. Their testimony was based on their own personal experiences with other warrant applications and on their understanding of the application process in general. In short, the trial court did not err in finding that it would have taken, at a minimum, between 45 minutes and about 90 minutes to obtain a search warrant. Consequently, this case requires us to address the question left open by our earlier DUII cases: when the state supports an exigency argument with specific, credible evidence of how long it would have taken police to obtain a search warrant, how are courts to determine whether that delay justifies a warrantless entry into a defendant's home?

A recent opinion by United States Supreme Court offers some guidance. In *Missouri v. McNeely*, ___ US ___, 133 S Ct 1552, 185 L Ed 2d 696 (2013), the Court considered how to apply the exigent circumstances exception to the warrant requirement in DUII cases. The Court observed that, "as a result of the human body's natural metabolic processes, the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated." *Id.* at ___, 133 S Ct at 1560. As a result of those metabolic processes, "a significant delay in testing will negatively affect the probative value of the results." *Id.* at ___, 133 S Ct at 1561.

The Court did not explain precisely when an ordinary delay becomes a "significant" delay. Nevertheless, it did suggest an answer to that question. The Court explained that, unlike "circumstances in which the suspect has control over easily disposable evidence," testing for BAC does not present a true "now or never" situation. *Id.* That is so because "BAC evidence from a drunk-driving suspect naturally dissipates over time in a gradual and relatively predictable manner." *Id.* That predictability allows police to measure a suspect's BAC level at a given point and use a technique called "retrograde extrapolation" to estimate that person's BAC level at an earlier point. *See, e.g., State v. Baucum*, 268 Or App 649, 661, 343 P3d 235 (2015) (defining "retrograde extrapolation" as "the mathematical process of plotting backwards a defendant's BAC on a BAC curve when given sufficient facts to do so"). Because of this ability to, in effect, reconstruct a person's BAC level at an earlier time, the dissipation of alcohol from the blood does not necessarily lead to the "destruction" of BAC evidence. Rather, such evidence is destroyed only when so much alcohol has been removed from the bloodstream that retrograde extrapolation can no longer produce a reasonably accurate estimate of the suspect's BAC at the time he or she was driving.

Further complicating matters is that police will often lack the information needed to make a reasonable prediction about how long it will take for a suspect's natural metabolic processes to destroy the BAC evidence. How much time police have to obtain a useful BAC test will depend on factors unlikely to be known to police in most cases, including the quantity of alcohol consumed, the peak BAC, and the rate of dissipation, which turns on an individual's physical characteristics and "the circumstances in which the alcohol was consumed." *McNeely*, ___ US at ___, 133 S Ct at 1560. It would be unworkable for courts to evaluate "exigency" in the light of facts about a suspect's body that are not known, and cannot reasonably be known, to the police at the time that they must make the crucial decision about whether or not to wait for a warrant. We therefore conclude that, after first showing how long it would take to obtain a search warrant, the state may prove exigency by further showing that police had an objectively reasonable belief that the circumstances

were such that, had they waited for that warrant, the suspect's blood would have lost all evidentiary value.

In this case, the state introduced evidence that substantiated such a belief. That is so for several reasons. First, to recount the timeline, Deputy Lorentz received his dispatch call at about 10:15 p.m. and arrived at the scene at 10:33 p.m. His observation of the truck in the ditch and his conversation with Wilson-McCullough gave him probable cause to believe, within a few minutes of 10:33 p.m., that defendant had driven while intoxicated. (Defendant does not dispute that on appeal.) After a few more minutes, Lorentz had established that defendant was not in his residence and, based on the rustling noise in the bushes, had likely fled the scene. Lorentz returned to his patrol car and drove away from defendant's residence at about 11:30 p.m. and Spini remained until 11:50 p.m., still with no sign of defendant. By that time, more than one and one-half hours had elapsed since defendant crashed the truck. An hour later, at 12:56 a.m., Spini returned to the residence and saw defendant enter the trailer. Lorentz and the Brookings officers arrived at 1:12 a.m. Defendant was placed into custody and transported from the scene at 2:03 a.m. Defendant arrived at the county jail at sometime after 2:00 a.m. and a breath test was performed shortly thereafter. Thus, without even factoring in the amount of time it would have taken to obtain a warrant, more than four hours elapsed from the time of the accident to when the breath test was performed.

Second, as the trial court found, the police in this instance appear to have acted as expeditiously as they could have. The investigation was begun within one-half hours of the accident. Approximately two and one-half hours were lost because of defendant's attempts to elude police. *See, e.g., People v. Toure*, 232 Cal App 4th 1096, 1104, ___ P3d ___ (2015) (finding exigent circumstances where "[t]he time it took to subdue defendant and transport him to the [California Highway Patrol] station, after conducting a brief investigation of the accident scene consumed approximately two hours"). The rest of the delay is attributable to the time it took for police to subdue and arrest defendant

and transport him to the county jail. In short, this case does not require us to decide whether, or how, an officer's own responsibility for delay might affect the exigency analysis. *See, e.g., Roberts*, 75 Or App at 296 ("Police officers cannot create their own exigencies by failing to familiarize themselves with constitutionally mandated procedures.").

Third, Spini testified that he was aware at the time of the encounter with defendant that the "average" alcohol dissipation rate is .015 percent BAC per hour.[1] Defendant does not dispute that assertion; it is also consistent with BAC dissipation rates that have been cited in other cases.[2] *See Machuca*, 347 Or at 647-48 (using an average dissipation rate of .015 percent); *McNeely*, ___ US at ___, 133 S Ct at 1560 (stating that the range of average dissipation rates is between "0.015 percent to 0.02 percent per hour once the alcohol has been fully absorbed"); *State v. Eumana-Moranchel*, 352 Or 1, 9, 277 P3d 549 (2012) (applying dissipation rates of between 0.01 and 0.025 percent per hour). There is no evidence that police knew or reasonably could have known either the quantity of alcohol that defendant consumed or the level of defendant's intoxication at the time of the accident. We conclude that, in the absence of contrary information about defendant's actual condition, police could reasonably rely on the presumptive threshold for DUII in Oregon—0.08 percent BAC by weight—as a guidepost.[3] With a dissipation rate of 0.015 per hour, it would take approximately five hours and 20 minutes for a person's BAC to drop from 0.08 to 0.00.[4] A little more than four hours elapsed

---

[1] The state did not seek to have Spini's testimony about average alcohol dissipation rates admitted as expert testimony at trial. Rather, Spini's testimony was for the sole purpose of explaining his belief that circumstances were exigent.

[2] We do not hold that, as a matter of law, 0.015 percent of BAC per hour is the average alcohol dissipation rate.

[3] As a factual matter, defendant's BAC level was almost certainly higher than 0.08 at the time of the accident, because it was measured at 0.14 four hours after the accident. But, again, the record contains no evidence that officers knew or should have known, at the time of the arrest, what quantity of alcohol defendant had consumed.

[4] The state does not argue that defendant's blood would have lost all evidentiary value at some time *before* his BAC reached 0.0 percent, nor is there any evidence on that score. The facts of this case do not require us to consider that possibility, because the record is sufficient to show a reasonable possibility that defendant's BAC would have reached zero before it could be tested. *See McNeely*,

between defendant's accident and the breath test. If police believed that it could take as long as 90 additional minutes to obtain a warrant (a reasonable estimation on this record), they could foresee a substantial possibility that defendant's BAC would have dropped from 0.08 (the threshold level for liability) to zero by the time it could be measured. On those facts, the police had an *objectively reasonable* basis to believe that waiting for a warrant would have resulted in the complete loss of evidence. In short, even considering the relative severity of the state's intrusion and the broadness of its scope, the timing of the search indicates that it was reasonable under these specific circumstances. *See Mazzola*, 356 Or at 820 (analyzing the reasonableness of a search under the exigent circumstances exception in light of the intrusion's "time, scope, and intensity").

For the foregoing reasons, we conclude that the state sufficiently proved an exigent circumstance that excused the need to obtain a warrant under the Oregon Constitution. We reach the same result under the federal constitution. That conclusion is based on the United States Supreme Court's analysis in *McNeely*, where the court held that police must obtain a warrant to investigate a person's BAC if they can do so "without significantly undermining the efficacy of the search." ___ US at ___, 133 S Ct at 1561. Likewise, *McNeely* suggests that the efficacy of any search is to be assessed based on the unique facts of every case, including the availability of retrograde extrapolation. *Id.* at ___, 133 S Ct at 1563. We therefore conclude that, for purposes of this case, the analysis under the federal constitution is indistinguishable from that under the Oregon constitution. Accordingly, the trial court did not err in denying defendant's motion to suppress.

Affirmed.

___

___ US at ___ 133 S Ct at 1563 (noting that "longer intervals may raise questions about the accuracy of the [retrograde extrapolation] calculation").