Argued and submitted January 14, 2020, reversed and remanded
September 1, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOSHUA SCOTT LIPKA,
aka John Scott Lipka, Sr.,
*Defendant-Appellant.*

Multnomah County Circuit Court
17CR82732; A167990

498 P3d 811

In this criminal appeal, defendant challenges his convictions for felon in possession of a firearm, menacing, and harassment. On appeal, defendant argues that the trial court erred by denying his motion to suppress evidence of a handgun and related statements obtained as a result of a warrantless search, and by giving instruction allowing and then accepting a nonunanimous jury verdict for the harassment charge. *Held*: Even assuming the police officers had probable cause to arrest defendant for a domestic-violence offense, the record in this case does not demonstrate that either of the arresting officers had a nonspeculative basis for searching defendant's bag for a handgun incident to arrest for menacing or harassment, and the erroneous admission of that evidence was not harmless as to those convictions. With respect to defendant's harassment conviction, it was error to instruct the jury that it could return a nonunanimous verdict and to accept and enter a judgment of conviction based on such a verdict.

Reversed and remanded.

Karin Johana Immergut, Judge.

Brett J. Allin, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the brief was Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

DeHOOG, J.

Reversed and remanded.

**DeHOOG, J.**

In this criminal appeal, defendant challenges his convictions for felon in possession of a firearm, menacing constituting domestic violence, and harassment. Defendant raises four assignments of error, asserting that the trial court erred by (1) denying his motion to suppress evidence of a gun and related statements obtained as a result of a warrantless search; (2) denying his post-verdict motion for a mistrial; (3) instructing the jury that it could return nonunanimous verdicts, and (4) accepting a nonunanimous verdict as to the harassment charge (Count 5). For the reasons that follow, we conclude that the trial court erred in denying defendant's motion to suppress, in instructing the jury regarding nonunanimous verdicts, and in accepting the jury's nonunanimous verdict on Count 5. Collectively, those errors were harmful as to each of defendant's convictions. Because our disposition as to those assignments of error entitle defendant to a new trial on all counts, we need not address whether the court abused its discretion in denying defendant's motion for a mistrial. We reverse and remand.[1]

## I.  BACKGROUND

A.  *Standard of Review*

We review the denial of a motion to suppress for legal error, deferring to the trial court's express and implicit findings of fact if there is constitutionally sufficient evidence in the record to support them. *State v. Brownlee*, 302 Or App 594, 596, 461 P3d 1015 (2020). If the trial court did not make findings on a disputed issue of fact, and there is evidence in the record to support divergent findings, we will presume the trial court decided the facts consistently with its ultimate conclusion. *Id.* Further, we review the denial of a motion to suppress in light of the record before the trial

---

[1] Similarly, we need not reach defendant's argument that it was structural and therefore harmful error for the trial court to incorrectly instruct the jury as to the counts on which it reached unanimous verdicts. However, we note that our recent case law appears to foreclose that argument. *See, e.g.*, *State v. Turay*, 313 Or App 45, 47, 493 P3d 1058 (2021) (citing *State v. Flores Ramos*, 367 Or 292, 319, 478 P3d 515 (2020) (nonunanimous jury instruction was not structural error); *State v. Ciraulo*, 367 Or 350, 354, 478 P3d 502 (2020), *cert den*, ___ US ___, 141 S Ct 2836 (2021) (unanimous jury verdict rendered erroneous nonunanimous jury instruction "harmless beyond a reasonable doubt")).

court at the time of its ruling, not the record as it later developed at trial. *State v. Pitt*, 352 Or 566, 574-75, 293 P3d 1002 (2012).

## B.   *Factual Background*

In December 2017, emergency dispatch received an open-line 9-1-1 call associated with a house in Southeast Portland.[2] Portland Police Bureau patrol officers Ballew and Adrian were dispatched to that location. Adrian arrived first and stopped about a block and a half from the house to wait for Ballew. Using the computer in his patrol car, Adrian confirmed that the phone number matched the address of the house. The 9-1-1 dispatcher, who had remained on the open line, informed Ballew and Adrian that a male and female could be heard arguing on the call. Adrian's computer inquiry disclosed that the alleged victim in this case, D, had reported several prior incidents involving her adult son (later identified as defendant), who also lived at the house and had multiple arrests on his record. Adrian was not able to access defendant's conviction record at that time, and he could not tell whether the arrests were for misdemeanors or felonies.

Upon Ballew's arrival, the officers approached the home on foot. Ballew heard both male and female voices from inside. Although the female voice was "pretty darn calm," the male voice was much more agitated and confrontational. Adrian characterized the voices he heard as a male yelling and a female trying to calm him down.

During a lull in the argument, the officers knocked on the front door. Ballew heard the female tell the male to open the door. Adrian told the male, whom Adrian believed to be defendant, someone he had met before, to come to the door. The female voice said, "Joshua, just let them in." According to Ballew, the male voice remained very agitated and said something like, "I'm telling you, if they lay hands on me, I'm going to lay hands on them." From what Adrian could hear from outside, his impression was that "[D] sounded scared. [Defendant] was really, really, really

---

[2] An open-line 9-1-1 call is a type of call where the caller does not directly speak to the emergency operator.

upset." Based on those impressions, Adrian requested "more officers immediately" before entering the house.

D ultimately told the officers the door was open and invited them inside. Upon entering the living room area of the house, the officers observed "overturned everything, everywhere," including a water dispenser that had been knocked over. D was cleaning up puddles of water from the toppled water dispenser.

As the officers entered, defendant was standing in the kitchen adjacent to the living room. Defendant then walked towards the door between the kitchen and the attached garage, ignoring Adrian's command to stop. Adrian noted that defendant was carrying a tan bag.

Ballew spoke with D. As they began to speak, D said very quietly to Ballew, "you know, he's got a gun. [In] [t]he tan [bag], the one he picked up." Adrian similarly heard D say "he's got a gun in that bag he is carrying."

By then, defendant had walked about 10 feet into the garage, where he paced and shouted at Adrian from a distance of 10 to 12 feet. Adrian observed that defendant had placed the tan bag on a chair but remained within a half step of the bag as the officers sought to control him with verbal commands. In addition to the bag, Adrian noted numerous other items in the garage—an axe, a baseball bat, a weight set, and (sometime later) a makeshift spear—that he believed might serve as weapons. Adrian gave defendant several specific commands, telling him, "Josh, I expect you to do everything I say. I don't want to use any level of force on you." Adrian told defendant that he believed a gun was involved somehow and asked him whether he was armed. Defendant responded, "I'm always armed." At that time, defendant remained "very animated, agitated," and he repeatedly put his hands in his pockets despite being told not to do so by Adrian.

Defendant ultimately complied with the officers' requests by taking two or three steps away from the chair and towards the officers, who were then able to place him in handcuffs. The officers patted defendant down for weapons, and Ballew read him the *Miranda* warnings. The process of

removing defendant from the garage and seating him in a chair in the kitchen took the officers about 30 seconds.

After defendant had been secured in the kitchen, Ballew again spoke with D, who told Ballew, "he jabbed me with something in the back, I don't know what it was. It could have been keys. And then another time he pinched me in the back of the arm." Ballew noted a bruise on D's arm. Ballew understood D to be saying that both the jabbing and pinching had occurred that day. Although D had speculated that defendant had jabbed her with some keys, Ballew believed that defendant might have done so with the gun that D had mentioned. Ballew acknowledged, however, that "[a]t no point did [D] say [defendant] used the gun today to threaten her."

While Ballew spoke with D, Adrian searched the bag that defendant had left on the chair in the garage, "[b]ecause [D] had mentioned that there was a gun in there. And we were looking at domestic violence investigation." In the bag, Adrian found a loaded, .22 caliber, semi-automatic pistol. Adrian asked defendant about the gun. Defendant acknowledged that he was a convicted felon and that he was aware that he could not legally possess a gun, but said that he carried the pistol for personal protection and had a holster for it in the waistband of the pants he was wearing.

The officers gave somewhat differing explanations for why they had handcuffed defendant. Ballew believed that defendant had been handcuffed for officer-safety purposes. Ballew later developed subjective probable cause to arrest defendant for assault based on D's statements and the injury to her arm.[3] She acknowledged, however, that she did not develop probable cause to arrest defendant until

_____

[3] Ballew's testimony at the suppression hearing was not entirely clear regarding the relationship in time between defendant being handcuffed in the garage, Ballew's development of subjective probable cause to arrest defendant for assault, and Adrian's search of the bag. Ballew suggested that, based on the injury to D, she had probable cause regarding assault "at the beginning." However, Ballew's testimony also indicated that her discussion with D was interrupted by the statement about the gun in the bag, and that Ballew did not learn about and observe the injury to D's arm until after defendant had been handcuffed in the garage and had been seated in the kitchen for at least some time. Ballew never stated whether her subjective development of probable cause to arrest defendant for assault occurred before or after the search of the bag.

after she had spoken with D a second time, which she did after defendant was handcuffed and seated in the kitchen. Later still, clearly after Adrian had searched the bag, Ballew developed subjective probable cause to arrest defendant for felon in possession of a firearm.

Adrian, on the other hand, testified that, at the time defendant was first put in handcuffs, "we had definitely a probable cause to believe that he had committed the crime of at least harassment, if not menacing with a gun." Adrian based that assessment on the statements that D had made about the gun, Adrian's perception that D had described defendant's behavior towards her as "assaultive," and defendant's lack of compliance. Adrian also made an "educated guess" that defendant "[was] probably going to have a felony on his record."

Ballew's and Adrian's recollections as to the timing of events also differed. Ballew estimated that defendant had been handcuffed and seated in the kitchen close to 10 minutes before Adrian searched the tan bag for a gun. And Ballew's estimate as to when she developed probable cause to arrest defendant for felon in possession of a firearm was closer to 20 minutes after he had been handcuffed, by which time he had been removed from the kitchen. Adrian's timeline was far more condensed. He testified that he had searched the bag "within a minute" of first handcuffing defendant and that defendant had been escorted to a patrol car "perhaps one minute" after being moved from the garage to the kitchen. Similarly to Ballew, however, Adrian acknowledged that he did not have probable cause to arrest defendant for felon in possession of a firearm until after he had interviewed him, which Adrian did not do until after he had searched the bag and discovered the gun.

C.  *Procedural Background*

Before trial, defendant moved to suppress all physical evidence and statements obtained as a result of his seizure, including the gun that Adrian had found in the bag and defendant's related admissions. Defendant argued that, because he had not been validly arrested pursuant to

probable cause, any search incident to his arrest was unlawful. Defendant further argued that, even if the officers had probable cause to arrest him for harassment or menacing, Adrian's search of the bag exceeded the lawful scope of a search incident to arrest for either of those offenses, because "menacing does not require a firearm *** [n]or does harassment." Finally, defendant argued that any exigency that would otherwise have supported an officer-safety search dissipated once the officers placed him in handcuffs and, therefore, the search of the bag could not be justified on that basis.

The state responded that the officers had probable cause to arrest defendant for felon in possession of a firearm based on Adrian's belief that defendant probably had a felony conviction due to his extensive arrest record; the state further argued that Adrian's discovery of the gun resulted from a lawful search incident to arrest for that offense. The state alternatively relied on the officer-safety exception, arguing that, even though defendant had been reduced to custody by the time Adrian searched the bag and discovered the gun, "he [was] still in the kitchen, which [wasn't] that far away at the time the search occurred," which presented an "ongoing officer safety issue."

The trial court concluded that Adrian's search of the bag was justified both as an officer-safety search and as a search incident to arrest. The court reasoned that, under the circumstances—which included the 9-1-1 call, the condition of the house, the overheard argument, and defendant's statement that he was "always armed"—the officers could lawfully detain defendant and "then do a protective search in the immediate vicinity as part of public safety." The trial court separately concluded that, under the totality of the circumstances, there was probable cause to arrest defendant and search the bag incident to that arrest. While the trial court did not expressly identify the particular crime for which the officers had probable cause,[4] it specifically *rejected* felon in possession of a firearm as a basis for defendant's

---

[4] The trial court stated that "at a minimum, with an allegation of harassment in the domestic violence context, that [the officers] were entitled to take him into custody at that point."

arrest, stating that it did not "accept the argument that the officer gets to guess about criminal history," without which the officers could not lawfully arrest defendant for that offense. Nonetheless, based on its conclusion that the warrantless search of the bag was otherwise justified, the trial court denied defendant's motion to suppress.

Following the denial of his motion to suppress, defendant tried his case to a jury. The jury found defendant guilty of felon in possession of a firearm, menacing, and harassment, and acquitted him of two separate counts of attempted coercion. The jury's verdict was unanimous as to the felon in possession and menacing charges, but not as to the harassment charge, Count 5. This appeal followed.

## II.   ANALYSIS

A.   *Motion to Suppress*

Article I, section 9, of the Oregon Constitution prohibits warrantless searches of "persons, houses, papers, and effects" unless a search "falls within one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Mazzola*, 356 Or 804, 810, 345 P3d 424 (2015). If a warrantless search occurs, the state must show that circumstances existing at the time of the search were sufficient to satisfy an exception. *Brownlee*, 302 Or App at 602.

Defendant's argument on appeal largely tracks the argument he made to the trial court. Specifically, defendant argues that warrantless search leading to the discovery of a gun was unlawful because (1) the officers lacked probable cause to arrest him when Adrian placed him in handcuffs, and any search incident to that arrest was therefore unlawful; (2) even if the arrest was supported by probable cause, Adrian's search exceeded the lawful scope of a search incident to arrest because, at the time of the search, the bag was no longer in defendant's immediate possession; and (3) to the extent that the officers could otherwise lawfully search the bag incident to defendant's arrest, the search was nonetheless unlawful because there are "neither instrumentalities

nor fruits" of the crimes of harassment or menacing for which Adrian could search.[5]

The state, on the other hand, takes a new tack on appeal. Rather than contending that the search can be justified on officer-safety grounds, the state has now abandoned that argument, reasoning that "the search was more clearly valid as a search incident to arrest." With respect to that rationale, the state has shifted its focus from the offense of felon in possession of a firearm and instead argues that (1) there was probable cause to arrest defendant for a domestic-violence crime, such as harassment or menacing; (2) the bag was in defendant's possession just before the arrest and the search was "otherwise reasonable in time, scope, and intensity[,]" and (3) Adrian had reason to believe that the gun was evidence of the crime of menacing.

We turn to those arguments. "A warrantless search incident to arrest can be made for any of three purposes: (1) to protect a police officer's safety; (2) to prevent the destruction of evidence; or (3) to discover evidence of the crime of arrest." *State v. Krause*, 281 Or App 143, 146, 383 P3d 307 (2016), *rev den*, 360 Or 752 (2017). The first two justifications rely on inherent exigencies—human safety and preventing destruction of evidence—that may dissipate once an arrestee is removed from the immediate area to be searched. *Id.* The third justification, however, is not wholly dependent upon such exigencies; thus, a search incident to arrest for the purpose of discovering evidence of the crime of arrest may reasonably be conducted at times and locations somewhat more distant than the first two purposes would justify. *Id.* Regardless of the purpose, a search incident to arrest "must be reasonable in scope, time, and intensity," and the search must relate to a crime for which there is probable cause for arrest. *Brownlee*, 302 Or App at 602. If

---

[5] Defendant also challenges the trial court's alternative rationale that the search could be upheld as an officer-safety search, contending that any officer-safety concerns had dissipated by the time of the search. The state does not defend that rationale on appeal. In the absence of any developed argument as to why the gun—which was in the garage while defendant was in the kitchen, handcuffed, seated, and controlled by at least two officers—presented an imminent threat to anyone's safety, we are not persuaded that the officer-safety exception to the warrant requirement applied here. Accordingly, we reject that basis for the trial court's ruling without further discussion.

a search conducted incident to arrest is otherwise reasonable in scope, time, and intensity, an officer may search a closed bag if the bag reasonably could contain evidence of the crime of arrest. *Krause*, 281 Or App at 146-47.

Here, the state relies on the third justification for searches incident to arrest—the discovery of evidence of the crime of arrest.[6] Defendant responds that, for three reasons, that rationale does not apply. According to defendant, (1) the arrest itself was unlawful because it was not supported by probable cause; (2) the bag was not in defendant's immediate control; and (3) Adrian did not search the bag for evidence related to the crime of arrest. Defendant argues that each of those reasons is sufficient to render Adrian's search unlawful. As explained below, we agree with defendant that, to the extent that Adrian may have had probable cause to arrest defendant for any offense, his search of the bag was not reasonably related to that offense. That implicates the first and third of defendant's arguments. Because we conclude that the trial court erred on that basis, we need not reach defendant's second argument, namely, that the bag was not sufficiently within his control to fall within the lawful scope of a search incident to arrest. *See Brownlee*, 302 Or App at 605 (relevant inquiry is not whether arrestee was holding or carrying item at the exact moment of arrest, but "whether the item or area searched was *immediately associated* with the arrestee at that time" (emphasis in original)).

We begin with defendant's argument that the officers lacked probable cause to arrest him for any offense. "A warrantless arrest is permissible under Article I, section 9, of the Oregon Constitution if the arresting officer has probable cause to believe that the person has committed a crime." *State v. Sanchez-Anderson*, 300 Or App 767, 772-73, 455 P3d 531 (2019). "Probable cause has two aspects: (1) the officer

---

[6] The freestanding officer-safety exception articulated in *State v. Bates*, 304 Or 519, 747 P2d 991 (1987), and the officer-safety justification for searches incident to arrest are functionally equivalent. *See State v. Hoskinson*, 320 Or 83, 87-88, 879 P2d 180 (1994). Given the state's decision not to defend the trial court's reliance on a freestanding officer-safety rationale, we do not understand the state to rely on the corresponding justification for searches incident to arrest, and we do not consider that rationale further. Similarly, the state does not contend that the search was reasonably necessary to prevent the destruction of evidence, and we likewise do not consider that possibility.

must subjectively believe that a crime has been committed, and (2) that belief must be objectively reasonable under the totality of the circumstances." *State v. Gibson*, 268 Or App 428, 430, 342 P3d 168 (2015). Defendant does not dispute that Adrian had at least subjective probable cause to make an arrest; rather, defendant claims that Adrian's subjective probable-cause determination was objectively unreasonable.[7]

The facts relevant to the objective probable-cause prong are those that the arresting officer knew at the time of the arrest. *Id.* In considering whether objective probable cause exists, we consider the totality of the circumstances presented to the officer, together with the reasonable inferences that may be drawn from them. *State v. Sinkey*, 303 Or App 673, 677, 465 P3d 284 (2020). Moreover, the facts that the officer perceived, either personally or as relayed to the officer, must in fact satisfy the elements of a crime. *See, e.g.*, *State v. Tiffin*, 202 Or App 199, 203, 121 P3d 9 (2005) (facts, as perceived by officer, must actually constitute a violation for officer's belief that violation has been committed to be objectively reasonable).

That is not to say that an officer must know exactly what law has been violated or how the facts relate to certain elements of the crime. Indeed, probable cause may be based on a mistake of fact or a mistake as to precisely "*which* law the defendant violated." *State v. Boatright*, 222 Or App 406, 410, 192 P3d 78, *rev den*, 345 Or 503 (2008) (emphasis in original). What matters is whether the facts that the officer perceives "establish the elements of *an* offense, even if not the offense that the officer believed the defendant committed." *Id.* (emphasis in original); *see also State v. Miller*, 345 Or 176, 186, 191 P3d 351 (2008) ("the officer's expressed reason for making an arrest does not control a court's determination of that arrest's legality"); *State v. Cloman*, 254 Or 1, 12, 456 P2d 67 (1969) ("We hold that if the officers had probable cause to arrest, the arrest made is not rendered illegal because the officers expressed another and improper cause for arrest.").

_____

[7] The state does not argue that Ballew's subjective probable cause to arrest defendant for assault was objectively reasonable. We therefore do not further consider that purported justification for defendant's arrest and the ensuing search.

        Additionally, to support probable cause, an officer need only perceive facts sufficient to establish the essential elements of a statutory violation, not necessarily facts with respect to every element, attendant circumstance, or culpable mental state required to ultimately convict a person of the crime. *Boatright,* 222 Or App at 411-12 (whether the defendant *knowingly* violated ORS 803.550 was not material to determination of objective probable cause, even if state arguably would be required to prove knowledge to obtain a conviction); *see also Gibson*, 268 Or App at 437 (officer had probable cause to arrest for unauthorized use of a vehicle even though it was not clear whether the defendant was the driver or the passenger of the stolen vehicle). However, when the facts an officer perceives do not meet the essential elements of the violation, probable cause is lacking. *See Sinkey*, 303 Or App at 677 (holding that the officer did not have sufficient information to make it more likely than not that the driver was physically or mentally impaired, an essential element of DUII); *State v. Keller*, 280 Or App 249, 254-55, 380 P3d 1144 (2016) (absence of facts indicating that defendant was in actual or constructive possession of heroin, an essential element of possession charge, precluded finding of objective probable cause to arrest for that offense).

        Here, as noted, the state contends that Adrian had probable cause to arrest defendant for a domestic-violence crime, such as harassment or menacing, and that Adrian had reason to believe that the gun in the tan bag was evidence of the crime of menacing. As potentially relevant here, a person commits the crime of harassment when the person intentionally harasses or annoys another person by subjecting the other person to "offensive physical contact." ORS 166.065(1)(a)(A).[8] To be convicted of menacing, defendant would have had to "intentionally attempt to place [D] in fear of imminent serious physical injury by words and conduct." *See* ORS 163.190. Thus to constitute probable cause, there must have been information from which an officer could conclude that defendant more likely than not had either

---

[8] ORS 166.065, the statute defining harassment has been amended several times since the alleged crime in ways that are not material to our analysis. *See* Or Laws 2017, ch 430, § 1; Or Laws 2019, ch 304, § 3. For convenience, we refer to the present version of the statute.

(1) intentionally harassed or annoyed D by subjecting her to offensive physical contact, or (2) intentionally attempted to place D in fear of imminent serious physical injury.

For purposes of discussion, we agree with the state, that, under the totality of the circumstances, it was objectively reasonable for Adrian to conclude that some form of "assaultive" conduct had occurred during the argument.[9] Given the open-line 9-1-1 call in which the dispatcher could overhear an argument, D's apparent unwillingness to communicate aloud with the dispatcher, Adrian's own perception of the verbal confrontation, and D's report to Ballew that defendant had jabbed her with something and pinched her arm, causing visible bruising, Adrian could at a minimum

---

[9] As a general matter, we understand "assaultive conduct" to encompass conduct that, under appropriate circumstances, might constitute either harassment or menacing. With respect to harassment,

"The act of striking another can be one of four different crimes depending upon the circumstances. The crime of harassment, ORS 166.065, a Class B misdemeanor, covers 'trivial slaps, shoves, kicks, etc.' *State v. Sallinger*, 11 Or App 592, 599, 504 P2d 1383 (1972), quoting from Commentary, Proposed Oregon Criminal Code 93. Third degree assault, ORS 163.165, a Class A misdemeanor, covers causing 'physical injury to another.' The draftsmen state that third degree assault is 'the basic offense,' which can be aggravated to a greater offense by the 'seriousness of the injury actually inflicted' or the 'dangerousness of the means employed *** to inflict injury.' Commentary, Proposed Oregon Criminal Code 93. Thus, second degree assault, ORS 163.175, a Class C felony, covers causing serious physical injury or causing any physical injury 'by means of a deadly or dangerous weapon.' (The most serious offense, first degree assault, ORS 163.185, a Class B felony, is not germane for present purposes.)"

*State v. Wier*, 22 Or App 549, 551-52, 540 P2d 394 (1975) (omissions and parentheses in original). With respect to menacing,

"At early common law, assault encompassed two separate concepts, the crime of attempted battery and the civil action for intentionally placing another in apprehension of an immediate battery. *** [T]he definition of criminal assault ***, at the time of the criminal code revisions, *** could be summarized as including both 'an act which reasonably puts one in fear of corporal injury' and 'an act intended to cause corporal injury by one who has the present ability to carry out such intent.' Commentary to Proposed Oregon Criminal Code 95, § 94 (1970).

"Among other amendments to the criminal code in 1971, the Oregon legislature defined the crime of assault. Assault now occurs when one intentionally, or with another specified mental state, causes some degree of physical injury to another. The alternative meaning of assault was not abandoned, however. '[T]he tort law derived concept of 'intentional creation of the apprehension of receiving a battery' *** will be retained under the proposed law as the newly designated offense of menacing.' *Id.* at 94."

*State v. Garcias*, 296 Or 688, 692-94, 679 P2d 1354 (1984).

reasonably believe that defendant more likely than not had subjected D to offensive physical contact, which would satisfy the essential elements of harassment.

Whether Adrian had probable cause to arrest defendant for menacing presents a closer call.[10] Upon entering the house, the officers were confronted by a chaotic scene, with defendant behaving angrily and defiantly, a water dispenser and "everything, everywhere" being overturned, and D, at least to Adrian, sounding scared. Before placing defendant in handcuffs—and therefore well before the search—Adrian also had heard from D that defendant had a gun, which could be perceived as signifying her fear of either defendant or what he might do with the gun. And even though arguably "furtive" actions, such as immediately walking away with a bag purported to hold a gun when the officers entered, do not alone "give rise to probable cause, they may add to a finding of probable cause when they are contemporaneous with the officer's observations of other information consistent with criminal activity." *State v. Pham*, 295 Or App 322, 327, 433 P3d 745 (2018), *rev den*, 364 Or 749 (2019) (internal quotation marks omitted).

On the other hand, although D gave Ballew information from which Ballew could reasonably have believed that defendant had at a minimum harassed her by poking and pinching her, D did not suggest that he had threatened her with serious physical harm, with or without the handgun. In its ruling, the trial court did not articulate how it interpreted those circumstances. *See Sinkey*, 303 Or App at 677 (whether an officer's subjective probable cause is objectively reasonable depends upon the totality of the circumstances). Indeed, the court never expressly relied on menacing as a basis for its ultimate ruling, stating instead that "at a minimum, with an allegation of *harassment* in the domestic violence context, that [the officers] were entitled to take him into custody at that point." (Emphasis added.) The

___

[10] Indeed, it is not entirely clear that Adrian himself believed that he had probable cause as to menacing. His testimony on that point was arguably ambiguous, in that he told the court that "we had definitely a probable cause to believe that he had committed the crime of at least harassment, if not menacing with a gun." Given defendant's apparent concession that Adrian had subjective probable cause regarding menacing, we likewise assume that Adrian purported to have probable cause as to that offense.

parties, on the other hand, appear to assume that the trial court concluded that Adrian had objective probable cause to arrest defendant for menacing.

Ultimately, we need not conclusively decide whether that ruling—if in fact the trial court made it—was legally correct. That is, even assuming that Adrian had probable cause to arrest defendant for *both* harassment and menacing, Adrian's subsequent search of the bag was not a reasonable search for evidence of either offense; it therefore cannot be upheld as a lawful search incident to arrest. As noted, defendant argues that, even if Adrian had probable cause to arrest him for a domestic-violence offense, he could not have been searching for evidence of either harassment or menacing, because, under the circumstances, those offenses would have had neither "instrumentalities nor fruits." Although we do not wholly agree with defendant's reasoning, we agree that, under these circumstances, Adrian's search of the bag was not a reasonable search for evidence of the offenses for which defendant was arrested. As a result, the search of defendant's bag exceeded the permissible scope or intensity of a lawful search incident to arrest.

In support of his argument, defendant cites *State v. Owens*, 302 Or 196, 200, 729 P2d 524 (1986), for the proposition that

> "if the person is arrested for a crime which ordinarily has neither instrumentalities nor fruits which could reasonably be concealed on the arrestee's person or in the belongings in his or her immediate possession, no warrantless search for evidence of that crime would be authorized as incident to that arrest."

While defendant's proposition may be true in the abstract, we do not agree that it necessarily controls here. The difficulty we see for the state's position is not so much that harassment and menacing are crimes that ordinarily have neither fruits nor instrumentalities, a matter on which we express no opinion. Rather, under the specific circumstances of this case, Adrian had no nonspeculative grounds to believe that a search of the bag would disclose evidence of the specific offenses that supported defendant's arrest. We recently addressed a similar circumstance as follows:

"The language from *Owens* on which defendant relies was meant to highlight the larger point that the court was making in *Owens*: To initiate a search incident to arrest, 'the arrest must be for a crime, evidence of which reasonably could be concealed on the arrestee's person or in the belongings in his or her immediate possession at the time of the arrest.' *** We do not agree with defendant's assertion that the crime of interfering with a police officer is a type of crime that would never justify conducting a search incident to arrest to find evidence of the arrestee's crime. Instead, we consider the specific circumstances surrounding [the officer's] search of [the] defendant's car to determine whether it was reasonable to believe that evidence reasonably related to the crime of arrest could be concealed in the location being searched."

*State v. Hernandez*, 299 Or App 544, 550-51, 449 P3d 878 (2019), *rev den*, 366 Or 292 (2020) (internal citations omitted). "The test for validity of a search incident to arrest is the reasonableness of the search in light of the circumstances of the particular case." *Id.* at 551 (brackets omitted).

As in *Hernandez*, we must consider "whether it was reasonable to believe that evidence reasonably related to the crime of arrest could be concealed in the location being searched." We conclude that it was not reasonable under the circumstances for Adrian to believe that a search of the bag—which Adrian acknowledged was for the gun that D had identified—would disclose evidence of the crimes for which defendant was arrested. D specifically told Ballew that defendant had jabbed her in the back with something—perhaps keys—and Ballew merely speculated that defendant might have done so with the gun that D mentioned. Mere speculation is not a basis to reasonably believe that the gun was evidence of defendant's alleged harassment.[11]

Similarly, even if Adrian had probable cause to arrest defendant for menacing, any belief that he had used the gun for that purpose would be impermissibly speculative. As discussed above, although D described defendant's conduct towards her and had previously told the officers

---

[11] The state does not posit that Adrian could have been searching for anything other than the gun that might have served as evidence of either harassment or menacing.

that defendant was in possession of a gun, at no point did she suggest that the gun had played any part in defendant's conduct. Thus, while Adrian certainly had a basis to believe that the bag would contain the gun, he had no nonspeculative reason to believe that it was used to menace D and would therefore be evidence of that crime. Accordingly, the trial court erred in denying defendant's motion to suppress the discovery of the gun and his related admissions that followed that discovery.

We conclude that the erroneous denial of defendant's motion to suppress was harmful to defendant in connection with his charges for felon in possession of a firearm and menacing, and the state does not argue against that conclusion. We conclude otherwise as to the harassment charge. Accordingly, we reverse the menacing and felon in possession convictions due to that error asserted in defendant's first assignment, but we proceed to separately address defendant's harassment charge under his supplemental assignments of error.

B.  *Nonunanimous Jury Instructions and Verdict*

Turning to defendant's first and second supplemental assignments of error, we first note that we need not address them insofar as they relate to the menacing and felon in possession charges, as we have just reversed them on other grounds. 314 Or App at 155 n 1. However, we must consider defendant's contention in his second supplemental assignment of error that, as to the harassment count, Count 5, it was error for the trial court to receive the jury's 11-1 verdict and to enter that conviction.

Defendant concedes that these arguments are not preserved and asks that we review for plain error. We agree that the trial court plainly erred and that it is appropriate to reverse defendant's harassment conviction on that basis. As we recently concluded, due process considerations require that, like more serious offenses subject to the Sixth Amendment unanimous-jury right, when a class B or less serious misdemeanor is tried to a jury, the jury must return a unanimous verdict to find the defendant guilty. *See State v. Heine*, 310 Or App 14, 21, 484 P3d 391 (2021). These due

process considerations turn on the same fairness consider-ations underlying the prohibition on nonunanimous guilty verdicts for serious offenses, and, for the reasons explained in *State v. Ulery*, 366 Or 500, 464 P3d 1123 (2020), we exer-cise our discretion to correct the plainly erroneous convic-tion for harassment.

Reversed and remanded.